984 F.2d 1118
 OXFORD FURNITURE COMPANIES, INC., a corporation,
Plaintiff-Counter-Defendant-Appellee,
v.
DREXEL HERITAGE FURNISHINGS, INC., a corporation, and Masco
Corporation, a corporation,
Defendants-Counterclaim-Plaintiffs-Appellants,
Trimas Corporations, Inc., etc., et al.,
Defendants-Counterclaim-Plaintiffs.
 No. 91-7586.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 14, 1993.
 
 Frank E. Lankford, Jr., Huie, Fernambuco & Stewart, Birmingham, AL, Hubert Humphrey, Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, NC, for appellant.
 James R. Pratt, III, James P. Rea, Hogan, Smith, Alspaugh, Samples & Pratt, PC, Birmingham, AL, for appellee.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before BIRCH, Circuit Judge, JOHNSON, Senior Circuit Judge, and THOMAS*, Senior District Judge.
 BIRCH, Circuit Judge:
 
 
 1
 A jury found defendants-appellants Drexel Heritage Furnishings, Inc. ("Drexel") and Masco Corp. ("Masco") liable to Oxford Furniture Companies, Inc. ("Oxford") for over $1.7 million in compensatory and punitive damages. Drexel and Masco advocate reversal on several grounds. We AFFIRM in part and VACATE in part.
 
 I. BACKGROUND
 A. Pertinent Facts
 
 2
 Oxford owned and operated several furniture retail stores in Birmingham, Alabama. Lanier Chew was the owner of Oxford, and Gary Kitchen was its chief financial officer. One of Oxford's competitors, Birmingham Wholesale Furniture Company ("Birmingham Wholesale"), was owned by Tommy McLeod. Drexel is a furniture manufacturing company and a wholly owned subsidiary of Masco.
 
 
 3
 For several years prior to 1989, Birmingham Wholesale was a dealer of Drexel furniture in Birmingham. During the 1980's, Drexel began opening retail "showcase" stores devoted exclusively to Drexel furniture. In the fall of 1988, Drexel and Oxford initiated discussions concerning the opening of a Drexel showcase store at one of Oxford's locations. This was the second time Drexel and Oxford had discussed the opening of a showcase store by Oxford. The first discussions in 1985-86 had terminated because Drexel was unwilling to terminate Birmingham Wholesale as its dealer and grant Oxford the exclusive Birmingham market for Drexel furniture. During the second round of discussions, Chew informed Drexel that he would open a showcase store only if Oxford was granted exclusivity in the Birmingham market. These discussions led to a January 4, 1989, meeting between Oxford and Drexel. Oxford was represented at the meeting by Chew and Kitchen. Drexel was represented by Tom Skipper, vice president of sales, Doug Lybrook, southeastern sales manager, and Max McClain, Birmingham sales representative.
 
 
 4
 Oxford contends that at this meeting Oxford and Drexel entered into a contract with the following terms: Oxford would open a showcase store at one of its five stores; Oxford would display a smaller gallery of Drexel furniture in a section of another store; Drexel would provide a favorable financing package to Oxford on the Drexel furniture; Oxford would be the exclusive Drexel dealer in Birmingham; the showcase store and gallery would premiere in September, 1991; and the contract was to exist as long as Oxford performed. Drexel contends that no contract was formed at this meeting.
 
 
 5
 Commencing in February, 1989, McLeod, the owner of Birmingham Wholesale, communicated his displeasure to Drexel concerning Drexel's discussions with Oxford. McLeod's dissatisfaction increased during the spring and was expressed to Drexel through correspondence and telephone conversations. At an April, 1989, furniture market show, Skipper, acting for Drexel, informed McLeod of Drexel's intent to open a showcase store with Oxford and to terminate McLeod as a Drexel dealer. At that meeting McLeod was informed that Birmingham Wholesale could purchase Drexel furniture to fill out existing Drexel lines, but as of September 1, 1989, Birmingham Wholesale would no longer be permitted to purchase new Drexel furniture.
 
 
 6
 Later at the furniture market, Oxford's Chew and Kitchen met with Drexel. At this encounter Drexel was represented by Skipper and Ernie Dehnert, Drexel's senior vice president. Skipper advised Chew that McLeod had been terminated and that Birmingham Wholesale would not be allowed to purchase Drexel furniture after September 1, 1989. Drexel contends that the result of this meeting was a contract between Oxford and Drexel similar in terms to the alleged January contract advanced by Oxford subject, however, to the satisfaction of two important conditions; first, McLeod had to be terminated as a Drexel dealer and, second, Oxford's credit worthiness had to be demonstrated to Drexel.
 
 
 7
 Following the April meeting, Oxford began preparing its stores for the Drexel displays. The preparation was aided by a Drexel designer who was sent to Birmingham to help Oxford. Oxford also eliminated a number of furniture lines that it carried from other manufacturers to accommodate the Drexel furniture.
 
 
 8
 In May, 1989, Drexel's parent company, Masco, became involved in the dispute between McLeod and Drexel. Fred Copeland, an officer of Masco and president of Masco's division containing its furniture manufacturing subsidiaries, including Drexel, met with McLeod in an attempt to mollify McLeod who was threatening litigation and other disruptions to Drexel's business. Following the meeting, Copeland contacted Drexel's Dehnert, questioned the advisability of the decision to terminate McLeod, and suggested that Dehnert reconsider Drexel's decision.
 
 
 9
 On June 19, 1989, Dehnert informed Oxford that Drexel had decided to rescind its termination of McLeod as a Drexel dealer, but that Drexel was willing to continue the deal with Oxford without the exclusivity arrangement. Oxford refused and canceled its plans to sell Drexel furniture. Oxford then set about to renew the lines it had abandoned in order to address the furniture supply shortfall it faced.
 
 
 10
 In 1989, Oxford incurred a large loss. Following the loss in 1989, Oxford sold two of its stores and began to liquidate another. The attempt to generate cash was unsuccessful and by 1991 all of Oxford's stores were closed.
 
 B. Procedural Path
 
 11
 In May, 1990, Oxford filed suit against Drexel and Masco. Oxford sought recovery claiming that (1) Drexel breached the contract between Oxford and Drexel, (2) Drexel fraudulently suppressed McLeod's objections to contract, and (3) Masco tortiously interfered with the contract. Oxford sought compensatory and punitive damages on all counts.
 
 
 12
 After a full presentation by both parties, the district court granted Oxford's motion for a directed verdict against Drexel on the breach of contract claim. The district denied Drexel's and Masco's motions for directed verdicts on the fraudulent suppression and tortious interference claims. The jury deliberated on those two claims and found that Drexel had committed fraud and that Masco had tortiously interfered with the contract between Oxford and Drexel. The jury awarded compensatory damages of $1,473,000 for each of the three claims. Each award was included in the other awards resulting in a total compensatory damage recovery of $1,473,000. The jury also found Masco liable for punitive damages of $250,000 for its tortious interference. The district court entered judgment against Drexel and Masco for $1,723,000. The district court denied Drexel's and Masco's motions for judgment notwithstanding the verdict or, in the alternative, a new trial.
 
 
 13
 On appeal, Drexel and Masco argue that the district court erred in granting Oxford's motion for a directed verdict on the contract claim, denying Drexel's and Masco's motions for directed verdicts on the fraudulent suppression and tortious interference claim, and submitting the punitive damage claim against Masco to the jury. They also contend that the evidence was not sufficient to support the jury's verdict awarding $1,473,000 in compensatory damages and that the closing argument of Oxford's counsel was improper.
 
 II. DISCUSSION
 A. Contract Claim
 1. Motion for Directed Verdict
 
 14
 Drexel complains that the district court should not have granted the directed verdict on the breach of contract claim because the terms of the contract were in dispute. Drexel submits that there was conflicting evidence as to the date of the formation of the putative contract, and the conditions precedent to the contract. Further, Drexel argues that the duration of the contract was indefinite, and under the UCC the contract was therefore terminable at will by either party subject only to reasonable notice. See Ala.Code § 7-2-309(2), (3) (1984).
 
 
 15
 We review the grant or denial of a motion for a directed verdict under the same standard used by the district court. MacPherson v. University of Montevallo, 922 F.2d 766, 770 (11th Cir.1991). All evidence and all reasonable inferences must be considered in the light most favorable to the nonmoving party. Id. The district court properly grants a directed verdict only if the facts and inferences are so strong that the court believes that reasonable persons in the exercise of impartial judgment could not arrive at a contrary verdict. Id. If, however, the evidence allows reasonable persons to reach different conclusions, the district court should deny a directed verdict. Id.
 
 
 16
 Five persons were present at the January 4, 1989, meeting between Oxford and Drexel. They were Oxford's Kitchen and Chew and Drexel's Skipper, Lybrook, and McClain. Kitchen, Chew, and McClain all testified that at this meeting Oxford and Drexel reached an agreement. The relevant terms of the contract were that by the fall of 1989, Oxford would be the exclusive Drexel dealer in Birmingham, Drexel would provide Oxford with a favorable financing package, and Oxford would open a showcase store and a gallery of Drexel furniture. The contract was to exist as long as Oxford performed.
 
 
 17
 Skipper disputed that a contract was formed at the January meeting. Instead, he testified that Drexel committed to the deal when Drexel and Oxford met again at the April furniture market. The April meeting was attended by Oxford's Chew and Kitchen and Drexel's Dehnert and Skipper. Skipper testified that an agreement was reached at this meeting, but that the agreement was subject to Drexel's credit approval of Oxford. He did not recall any discussions concerning the term of the contract. Dehnert agreed with Skipper that the agreement was consummated in April not January. According to Dehnert, the pact was subject to two conditions: the credit approval of Oxford and the elimination of Birmingham Wholesale as a Drexel dealer leaving Oxford as the exclusive Drexel dealer in Birmingham.
 
 
 18
 The time of contract formation was clearly subject to conflicting testimony. Three witnesses testified that the contract was formed in January, while two witnesses testified that the contract was formed in April. The district court, however, held that it was not necessary to determine the date on which the contract was formed to direct a verdict because all the parties agreed that a contract was formed and that it had been breached. Drexel's counsel stated during opening remarks:
 
 
 19
 This case involves a contract. Nobody denies that. I also want to tell you straight up front that never have I denied or Drexel denied that we promised that we would cut off his competition. We told him we'd cut off his competition. We told him we'd terminate Tommy McLeod, and then we didn't. We're going to tell you why.
 
 
 20
 R5-24. The testimony of all witnesses was consistent with this statement. Further, the district court instructed the jury that it was for them to decide when the contract was formed if necessary to determine the amount of Oxford's damages. Under these circumstances the grant of the directed verdict was proper.
 
 
 21
 When the evidence is construed in a light most favorable to Drexel, the contract was conditioned upon Drexel's credit approval of Oxford and the termination of Birmingham Wholesale as a Drexel dealer. At trial, however, Drexel did not claim that the credit approval of Oxford was the basis for Drexel's nonperformance of the contract. Drexel stipulated that its decision not to proceed with the contract was not based on the credit approval process.
 
 
 22
 The termination of Birmingham Wholesale was accomplished at the April market. Drexel's Dehnert, Skipper, and McClain all testified that at the April market McLeod was informed that Birmingham Wholesale was terminated as a Drexel dealer. The termination permitted Birmingham Wholesale to continue to purchase Drexel furniture on a limited basis in order to fill out its current lines. After September 1, 1989, however, Birmingham Wholesale would no longer be permitted to purchase Drexel furniture. The district court, therefore, properly concluded that Drexel breached the contract when it rescinded its decision to terminate Birmingham Wholesale.
 
 
 23
 Finally, we are faced with Drexel's claim that the contract was indefinite in duration and, therefore, terminable at will under the UCC. Under this analysis, Drexel argues that it could not breach the dealership agreement. Chew, Kitchen, and McClain all testified that the contract was to last as long as Oxford performed. Skipper testified that he did not recall any discussions concerning the duration of the contract. Based on this evidence, Drexel contends that the contract term was indefinite.
 
 
 24
 We reject Drexel's claim that it was not possible to breach the contract because the contract was indefinite and, therefore, terminable at will under Ala.Code § 7-2-309(2). All of the witnesses testified that Drexel had failed to fulfill its promises to terminate Birmingham Wholesale. None of the witnesses testified that Oxford had been terminated in accordance with the UCC provision. Drexel's counsel conceded as much in his opening statement. Since this theory was not adequately presented at trial, the district court properly gave no instruction on it. Rohner, Gehrig & Co. v. Capital City Bank, 655 F.2d 571, 577 (5th Cir. Unit B Sept. 1981) ("No need exists for an instruction, however, on an issue not presented by the pleadings nor effectively raised at the trial.").
 
 
 25
 In summary, we find that the district court properly granted Oxford's motion for a directed verdict on the breach of contract claim. The district court correctly allowed the jury to determine whether the date of formation of the contract affected Oxford's damages. We also conclude that the district court properly instructed the jury that the only remaining issue on the contract claim was to determine the amount of Oxford's damages.
 
 2. Statute of Frauds
 
 26
 Drexel argues that the application of the Alabama statute of frauds, Ala.Code § 7-2-201, bars the enforceability of any contract which may have existed between Drexel and Oxford. Oxford's complaint was filed on May 14, 1990. Drexel's answer was submitted on October 10, 1990. On March 18, 1991, Drexel filed a motion to amend its answer and attempted to interject the statue of frauds as a defense to the breach of contract claim. On March 25, 1991, a pretrial conference was held. The pretrial order was filed the next day. The district court denied Drexel's motion to amend its answer.
 
 
 27
 We review the district court's denial of the motion to amend for an abuse of discretion. Sun Bank, N.A. v. E.F. Hutton & Co., 926 F.2d 1030, 1035 (11th Cir.1991). Drexel's motion to amend was filed ten months after Oxford's complaint and seven days before the pretrial conference. Drexel gave no reason for waiting to raise the statute of frauds defense. The district court did not abuse its discretion by denying Drexel's motion to amend under such circumstances. Because the statute of frauds defense was not timely raised at trial, we will not consider the merits of the defense on appeal.
 
 B. Fraudulent Suppression Claim
 
 28
 Oxford claimed at trial that Drexel had engaged in fraudulent suppression by failing to disclose McLeod's threats to sue Drexel, Masco and Oxford, to flood the Birmingham market with Birmingham Wholesale's excess Drexel furniture, and to "bury" Chew if Drexel proceeded with its termination of Birmingham Wholesale. The district court rejected Drexel's motion for a directed verdict. We review the denial of a motion for a directed verdict under the standard discussed above.
 
 
 29
 Under Alabama law, a plaintiff must establish four elements to support a fraudulent suppression claim: (1) a duty to disclose facts, (2) concealment or nondisclosure of material facts by the defendant, (3) inducement of the plaintiff to act, and (4) action by the plaintiff to his injury. Norman v. Amoco Oil Co., 558 So.2d 903, 905 (Ala.1990). See Ala.Code § 6-5-102 (1975). Drexel argues that Oxford failed to satisfy its burden to establish each of these elements.
 
 
 30
 The first element, the duty to disclose, "may arise from the confidential relations of the parties or from the particular circumstances of the case." Ala.Code § 6-5-102. In determining whether a duty arises under this section, the relation of the parties, the value of the particular fact suppressed, the relative knowledge of the parties, and other circumstances are to be weighed. Bank of Red Bay v. King, 482 So.2d 274, 285 (Ala.1985). The question of the existence of a duty to communicate is generally for the jury to decide. Lowder Realty, Inc. v. Odom, 495 So.2d 23, 26 (Ala.1986).
 
 
 31
 In 1986, Drexel and Oxford discussed a proposal for the opening of a Drexel showcase store. The proposal, however, never materialized because Drexel was not able to provide Oxford with exclusivity in the Birmingham market. Therefore, when Drexel approached Oxford in 1988, Drexel was aware that Oxford had previously requested market exclusivity. Following the January meeting between Oxford and Drexel, McLeod questioned Drexel's dealings with Oxford in various correspondence. McLeod balked at being terminated as a Drexel dealer at the April market when Drexel informed him of its plans with Oxford. Drexel's McClain also testified that McLeod stated he would "bury" Chew if Drexel carried out its plan. Following Drexel's confrontation with McLeod, Drexel met with Oxford and assured it that Birmingham Wholesale had been terminated. Oxford, however, was not informed of McLeod's statements. Later in April, McLeod renewed his threats of litigation and a disruption of the Birmingham market.
 
 
 32
 We find that there was a question as to whether the particular facts of this case created a duty on the part of Drexel to communicate McLeod's threats to Oxford. There was a history of relevant prior dealings between the two parties. Further, the exact date of the formation of the contract is uncertain and some of McLeod's threats may have occurred before Drexel contracted with Oxford and after Drexel informed Oxford that Birmingham Wholesale had been terminated. This, coupled with Alabama's preference that the jury resolve the question of duty to communicate, persuades us that the district court properly allowed the jury to reach that decision.
 
 
 33
 The second element of a fraudulent suppression claim is the nondisclosure of a material fact. According to Chew's testimony, Oxford did not learn of McLeod's statements to Drexel until May 19, 1989, several weeks after McLeod's threats. Hence, the district court properly allowed the jury to determine if the length of time between McLeod's threats and disclosure to Oxford amounted to nondisclosure. The Alabama courts have defined materiality as "a fact of such a nature as to induce action on the part of the complaining party." Bank of Red Bay, 482 So.2d at 282. Materiality is generally a question for the jury. Id. at 282; Jim Walter Homes, Inc. v. Waldrop, 448 So.2d 301, 305 (Ala.1983). In Bama Budweiser v. Anheuser-Busch, Inc., 611 So.2d 238, 244 (Ala.1992), the Alabama Supreme Court held that a "representation that causes a person to do nothing more than he was already contractually obligated to do before the representation was made is not material and therefore cannot support a fraud action." In the present case, however, it is uncertain when the contract was formed. Indeed, under Drexel's version of events, the contract was not formed until the April market meeting. This meeting occurred after Oxford was advised that McLeod had been terminated and that everything was proceeding, despite McLeod's communication of serious threats. Therefore, we find that the district court properly allowed the jury to determine if McLeod's threats were material.
 
 
 34
 As to the third element of the fraudulent suppression claim, inducement, the evidence conflicted as to whether Oxford was persuaded to contract with Drexel because it was unaware of McLeod's threats. Thus, the jury was properly allowed to determine whether Drexel induced Oxford into taking action it would otherwise not have pursued.
 
 
 35
 As to the fourth element, damages, Drexel argues that any damages arising from a claim of fraudulent suppression must necessarily be subsumed within the breach of contract claim. Therefore, there can be no fraudulent suppression damages where contract damages are awarded. Under Alabama law, however, a single transaction can support an award of damages for both breach of contract and fraud as long as the judge instructs the jury that there can be no double recovery. Deupree v. Butner, 522 So.2d 242, 244-45 (Ala.1988). In this case, the district court, with agreement of the parties, instructed the jury that any damages awarded under the fraudulent suppression claim would be included in the damages awarded under the contract claim. The jury awarded $1,473,000, all of which was included in the award on the contract claim. This instruction prevented any double recovery by Oxford and satisfied the requirements of Deupree. Accordingly, the district court properly allowed the jury to determine the damages Oxford had sustained.
 
 
 36
 In summary, we find that Oxford presented sufficient evidence to allow reasonable persons to reach different conclusions on whether Drexel had engaged in fraudulent suppression. Therefore, we find that the district court properly denied Drexel's motion for a directed verdict on this claim.
 
 C. Tortious Interference
 
 37
 At trial, Oxford alleged that Masco, Drexel's parent corporation, had tortiously interfered with the contract between Drexel and Oxford. The alleged interference occurred during a telephone call from Masco's Copeland to Drexel's Dehnert in which Copeland requested that Drexel reconsider its decision to terminate Birmingham Wholesale. The district court denied Masco's motion for a directed verdict.
 
 
 38
 Masco argues that it cannot be liable for tortious interference with the contract because Drexel is Masco's wholly owned subsidiary. Under Alabama tortious interference law, the alleged tortfeasor "must be independent of, or a third party to," the contract at issue. Harrell v. Reynolds Metals Co., 495 So.2d 1381, 1387-88 (Ala.1986). Put differently, "a party to a [contract] cannot be held liable for interference with that [contract]...." Williams v. A.L. Williams & Assocs. Inc., 555 So.2d 121, 124 (Ala.1989). Alabama law also recognizes that a parent corporation is a distinct entity from its subsidiary and that the parent is not liable for the acts of its subsidiary unless the subsidiary is "a mere adjunct, instrumentality, or alter ego of the parent corporation." Ex parte Baker, 432 So.2d 1281, 1284 (Ala.1983). Masco must thus demonstrate that it was either a party to the transaction or that Drexel was merely its alter ego.
 
 
 39
 Masco's involvement in the contract was limited. Drexel's employees testified that they consulted with Masco's attorneys before beginning negotiations with Oxford. The consultations concerned the ability of Drexel to terminate Birmingham Wholesale as a Drexel dealer without incurring liability. Masco's Copeland also testified that all of Drexel's profit or loss was distributed to Masco and that Masco filed a consolidated tax return covering both Masco and Drexel.
 
 
 40
 There was no showing, however, that Masco took part in the negotiations between Oxford and Drexel. There was also no evidence that Masco was a party to the contract between Oxford and Drexel or that the contract was in any way dependent on Masco. No evidence was introduced that Masco enjoyed any rights or incurred any obligations under the contract. Further, there was no showing that Drexel was the "mere adjunct, instrumentality, or alter ego" of Masco. Under these circumstances we conclude that Masco was not immune from a claim of tortious interference. The district court properly submitted the tortious interference claim to the jury.
 
 D. Punitive Damages
 
 41
 The jury assessed $250,000 to Masco in punitive damages for tortiously interfering with the contract between Drexel and Oxford. Masco contends that there was insufficient evidence to support the jury's award of punitive damages and that the district court improperly instructed the jury on the issue of punitive damages.
 
 
 42
 Under Alabama law, punitive damages may be awarded when "it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." Ala.Code § 6-11-20(a) (Supp.1992). The statute also defines the relevant terms. Oppression is "[s]ubjecting a person to cruel and unjust hardship in conscious disregard of that person's rights." § 6-11-20(b)(5). Wantonness is "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." § 6-11-20(b)(3). Malice is "[t]he intentional doing of a wrongful act without just cause or excuse, either: a. With an intent to injure the person or property of another person or entity, or b. Under such circumstances that the law will imply an evil intent." § 6-1120(b)(2). Drexel argues that there was insufficient evidence to support punitive damages under any one of the three grounds.[1]
 
 
 43
 In April, 1989, Birmingham Wholesale's McLeod sent Masco's Copeland a letter that proposed a method for Drexel to acquire Birmingham Wholesale's total inventory of Drexel furniture. The letter also threatened litigation against Masco and Drexel if a solution acceptable to McLeod was not reached. Following receipt of the letter, Copeland met with McLeod. After the meeting, Copeland contacted Drexel's Dehnert and urged him to reconsider the decision to terminate Birmingham Wholesale. Dehnert did reconsider and, in June, informed Oxford that Birmingham Wholesale would not be terminated and that Oxford would not be given the exclusive Birmingham market. There was also evidence produced which suggested that Drexel in 1985, before it had been purchased by Masco, had attempted to persuade Oxford to open a showcase store. That effort, however, was fruitless because Copeland, as the then president of Drexel, was not in favor of terminating Birmingham Wholesale. The 1985 incident, however, did not involve Masco in any way.
 
 
 44
 Viewing the facts in a light most favorable to Oxford, we do not opine that a reasonable jury could find by clear and convincing evidence that Masco had engaged in oppressive, wanton, or malicious conduct. Masco's conduct was not oppressive; it did not subject Oxford to cruel and unjust hardship. The conduct was also not wanton; it was not made with a reckless or conscious disregard of the rights or safety of Oxford. Likewise, the conduct did not constitute malice; it was not done with the intent to injure Oxford or under such circumstances that the law would imply an evil intent. Instead, Copeland's actions were part of a dispassionate business decision. The business decision resulted in the breach of the contract between Drexel and Oxford and required Masco and Drexel to compensate Oxford for the breach. The only arguable basis for imposing punitive damages on Masco is that its actions were wanton; that is made with a conscious disregard for Oxford's rights. Oxford's rights under the contract, however, consisted of the right to have Drexel perform the contract or the right to collect damages if Drexel failed to perform. Masco did nothing to prevent Oxford from receiving compensatory relief in lieu of Drexel's performance of the contract. Therefore, Masco did not consciously disregard Oxford's rights. We are persuaded that Copeland's actions did not rise to the level required under Alabama law for the imposition of punitive damages.
 
 E. Compensatory Damages
 
 45
 After finding Drexel liable for breach of contract and fraudulent suppression and Masco liable for tortious interference, the jury awarded Oxford $1,473,000 in compensatory damages. Drexel and Masco contend that the award should be overturned.
 
 
 46
 Drexel and Masco first argue that the district court should have instructed the jury that under Ala.Code § 7-2-309, Oxford was only entitled to damages that resulted from the lack of reasonable termination notice given to Oxford by Drexel. In effect, Oxford's damages would be limited to the period it took for Oxford to find substitute suppliers. As we noted above, however, Drexel did not properly raise at trial the theory that the contract was terminable at will. The district court should not give an instruction which deals with an issue that is not properly before the jury. Pesaplastic, C.A. v. Cincinnati Milacron Co., 750 F.2d 1516, 1525 (11th Cir.1985). The district court properly rejected a charge instructing the jury on this theory.
 
 
 47
 Drexel and Masco next argue that the evidence concerning damages presented by Oxford was so conjectural that there was no proper basis for the amount the jury awarded in compensatory damages. Oxford's claim for damages was based almost exclusively on lost profits. Alabama law requires that the plaintiff provide enough evidence at trial so that the jury has a basis for estimating lost profits with "reasonable certainty." Mason & Dixon Lines, Inc. v. Byrd, 601 So.2d 68, 71 (Ala.1992); Super Valu Stores, Inc. v. Peterson, 506 So.2d 317, 327 (Ala.1987).
 
 
 48
 Oxford's evidence on damages was based on the testimony of Kitchen, Oxford's chief financial officer, and Fred Johnson, an economist acting as Oxford's expert witness. Kitchen testified on Oxford's past performance. Based on the past performance, Kitchen projected Oxford's profits from 1989 through the date of trial as if Oxford had continued with its business as it existed before 1989. Kitchen then compared these profits with the actual losses which Oxford incurred from 1989 to the date of the trial. Kitchen stated that these losses were attributable to the cancellation of the Drexel deal based upon the serious disruption that the subsequent cancellation had caused to Oxford's business. Under this analysis, the total loss resulting from Drexel's actions was over $1.3 million.
 
 
 49
 Johnson used a different methodology in attempting to determine the losses which Oxford suffered because of Drexel's actions. Johnson calculated the gross sales which the showcase store would generate based on the average sales in a Drexel showcase store. From this figure Johnson subtracted the operating expenses of Oxford and arrived at a net profit figure. Johnson repeated these calculations for a ten year period of time with each future year discounted to present value. Based on these calculations, Johnson estimated lost profits for five year and ten year periods. The lost profits for five years was over $1.9 million and for ten years was over $3.1 million.
 
 
 50
 We find based on this evidence that Oxford produced sufficient evidence so that the jury had a basis to estimate Oxford's losses with reasonable certainty. The award of $1,473,000 is slightly greater than Kitchen's estimate but significantly less than Johnson's. We, therefore, decline Drexel's invitation to reject the jury's determination of damages.
 
 
 51
 Finally, Drexel and Masco contend that the district court failed to instruct the jury with the specificity required under the facts of this case. They charge that the district court's instructions consisted of abstract generalities that did not provide the jury with sufficient guidelines to determine damages. In reviewing a district court's instructions, we look to see whether the charges as a whole "sufficiently instruct the jury so that the jurors understand the issues involved and are not misled." Pesaplastic, 750 F.2d at 1525. After reviewing the instructions given by the district court, we find that they were sufficient to give the jury a clear and accurate understanding of the damages issue in this case.
 
 F. Oxford's Closing Statement
 
 52
 Drexel and Masco argue that the closing statement of Oxford's counsel was permeated with prejudicial and improper statements of such quality and quantity that we must order a new trial. No objection was made to any of the statements that Drexel and Masco now claim were prejudicial. Our general rule is that a timely objection is necessary to bring to the district court's attention errors in counsel's arguments. Woods v. Burlington Northern R.R. Co., 768 F.2d 1287, 1292 (11th Cir.1985) (per curiam), rev'd on other grounds, 480 U.S. 1, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987). When no objections are raised, we review the arguments for plain error, but a finding of plain error "is seldom justified in reviewing argument of counsel in a civil case." Id. Nevertheless, when the interests of substantial justice are at stake, we may order a new trial. McWhorter v. City of Birmingham, 906 F.2d 674, 677 (11th Cir.1990) (per curiam) (counsel argued theory in closing that the district court had specifically prohibited in granting a motion in limine and referred to an exhibit that was not on the parties' pretrial exhibit list). The philosophy underlying this rule was well stated in Woods.
 
 
 53
 Requiring timely objection prohibits counsel from "sandbagging" the court by remaining silent and then, if the result is unsatisfactory, claiming error. Second, there are a number of good reasons why skilled trial counsel may make a tactical decision not to object to improper argument: (1) an argument that looks highly improper in a cold record may strike counsel as being wholly lacking in effect; (2) because of the 'chemistry' of the courtroom counsel may think that the improper argument may offend and in effect backfire; and (3) the improper argument may open the door to a response that will be of more value than a sustained objection.
 
 
 54
 768 F.2d at 1292 (citations omitted).
 
 
 55
 Drexel and Masco argue that the errors present in the closing statement of Oxford's counsel included statements for which there was no supporting evidence, outright misstatements of the evidence, expressions of counsel's personal opinions, comments on counsel's own involvement with Oxford and Oxford's witnesses, appeals to local prejudice against out-of-state corporations, and improper references to loss of jobs and taxes.
 
 
 56
 At a post-trial hearing, the district court was informed that Drexel and Masco were arguing on appeal that the verdicts against them should be overturned because of the prejudicial nature of the closing argument of Oxford's counsel. The district court stated, "[t]hat certainly is not the most inflammatory argument I ever heard by any means. It is nowhere close. I think it was curable. There wasn't any effort made to get me to cure it." R9-21.
 
 
 57
 We agree with the district court. After reviewing Drexel's and Masco's claims and the closing argument of Oxford's counsel, we find that the arguments do not rise to the level of plain error. We find support in our decision in the fact that Drexel and Masco, while now claiming severe prejudice because of the argument, made no attempt to object to the arguments when they were made.
 
 III. CONCLUSION
 
 58
 The district court properly granted a directed verdict on the breach of contract claim while allowing the jury to determine if the date of formation affected damages. The motions for directed verdict on the fraudulent suppression and tortious interference claims were properly rejected. The jury was erroneously allowed to award punitive damages on the tortious interference claim. We, therefore, vacate the award of punitive damages. There was, however, sufficient evidence to support the jury's award of compensatory damages. Finally, the closing arguments of Oxford's counsel did not amount to plain error.
 
 
 59
 We AFFIRM in part and VACATE in part.
 
 
 
 *
 Honorable Daniel H. Thomas, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation
 
 
 [1]
 Oxford does not argue that Masco engaged in any fraud