**Patricia SMITH, Plaintiff,**

v.

**MOUNT SINAI MEDICAL CENTER OF GREATER MIAMI, INC., a non-profit corporation, Defendant.**

No. 96–1133–CIV–UUB.

United States District Court,
S.D. Florida.

April 22, 1998.

Nicolas Andres Manzini, Manzini & Associates, Miami, FL, for Patricia Smith.

Averill G. Marcus, Manas & Marcus, Miami, FL, for Mount Sinai Medical Center of Greater Miami, Inc.

Martin B. Goldberg, Miami, FL, for North Shore Medical Center, Inc.

### ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

UNGARO–BENAGES, District Judge.

THIS CAUSE is before the Court upon the motion of Defendant Mount Sinai Medical Center of Greater Miami, Inc.'s ("Mount Sinai") for entry of judgment as a matter of law at the close of the Plaintiff's case with respect to Plaintiff's claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, and 42 U.S.C. § 1981. With respect to both claims, the Plaintiff, who is African–American, alleges that while employed by Mt. Sinai she wrongfully came under suspicion of having an interracial relationship with a cardiology fellow and that thereafter she was harassed to the extent that her working conditions became intolerable and she was forced to resign. For the reasons stated below, the Defendant's Motion is GRANTED.

### FACTS

The material facts viewed in the light most favorable to the Plaintiff are as follows:

Plaintiff worked at Mount Sinai from May, 1989, until April 10, 1996 when she resigned. At all times material to this case, she held the position of medical assistant in the cardiology department. Her duties included taking electrocardiograms (EKGs), drawing blood, distributing lab results to the physicians, assisting in patient examinations, maintaining patient charts, and interacting on behalf of the physicians with the patients.

In September, 1994, rumors were circulating among the fellows in the cardiology department that the Plaintiff was having a so-cial or sexual relationship with Dr. Braun, a cardiology fellow who had recently joined Mt. Sinai. Braun is Caucasian. Also in September, 1994, Griselle Chernys, administrator of the cardiology department, asked the Plaintiff and others in the cardiology department to participate in an upcoming Heart Walk. When the Plaintiff declined to participate, Chernys told the Plaintiff, "I won't forget that." The Plaintiff reacted to this comment by becoming so angry and tearful that she had to leave work for the day. As a result of that incident the Plaintiff was referred to Psychiatric Clinical Nurse Specialist Nancy Oeler for counseling.[1]

Until April of 1995, the Plaintiff had never been disciplined in writing, and prior to September, 1995, her annual performance evaluations had reflected better than average performance in all relevant areas. On April 6, 1995, Dr. Lamas, the head of the cardiology department, Chernys, the administrator of the cardiology department, and Barbara Shobaken, Mount Sinai's director of human resources, summoned the Plaintiff to a meeting. During the meeting, the Plaintiff was told by Shobaken that the fellows in cardiology had complained that the Plaintiff was beeping them, calling them and otherwise making inappropriate inquiries concerning one of the fellows.[2] The Plaintiff denied that she had engaged in any such conduct and requested the right to rebut the allegations. On April 14, 1995, the Plaintiff was presented with a written disciplinary action report summarizing the accusations signed by Chernys and Shobaken. The report stated, "This behavior should not continue and if it does continue further disciplinary action will result." The Plaintiff was requested to sign the form but demurred indicating that she would prepare a written rebuttal by April 21.

---

1. There is evidence in the record to suggest that at this meeting the Plaintiff advised Oeler that she was under great stress due to her marriage and that her husband had been verbally and physically abusing her for some 20 years. Regardless of whether the Plaintiff actually communicated this fact to Oeler at this particular meeting, the undisputed evidence presented during Plaintiff's case-in-chief was that the Plaintiff had suffered significant physical abuse from her husband since at least May, 1983 and that, by the time of the April 21 meeting discussed *infra*, Barbara Shobaken, Mt. Sinai's director of hu-man resources, had learned that the Plaintiff was involved in a physically abusive marriage. Also, there was undisputed evidence that by the end of 1994 the Plaintiff had sought treatment from her family doctors for depression "due to problems at home" and had been prescribed antidepressants.

2. Actually, the complainant was Dr. Braun, and he had complained to Dr. Lamas about the Plaintiff's conduct toward him, but that fact was never revealed to the Plaintiff.

On April 14, 1995, the Plaintiff was also presented with another written disciplinary action report. This report, which was signed by Carmen Rosa, Plaintiff's immediate supervisor, and Chernys, concerned a disagreement that had occurred on April 4, 1995 in the presence of cardiology patients between the Plaintiff and a department receptionist. The dispute concerned the proper procedure for handling of a patient chart. The disciplinary action report reflects that the Plaintiff denied yelling at a co-worker. Similar to the earlier report, this report stated, "This kind of behavior is unacceptable and should not occur again as that would be grounds for further disciplinary action."

On April 21, 1995, the Plaintiff met with Shobaken and Chernys to deliver and discuss her rebuttal to the charge that she had been engaging in inappropriate conduct with respect to a cardiology fellow. During that meeting, Shobaken stated that the Plaintiff's work performance was not in question, but that Mt. Sinai would not tolerate an interracial relationship between the Plaintiff and Braun. The Plaintiff was, in her words, "shocked" that Shobaken had made this statement.[3] After this meeting, the Plaintiff never heard the rumors again.

On or about July 26, 1995, the Plaintiff had a nasty disagreement with Rosa, her supervisor, concerning whether the Plaintiff had been tardy in returning to her work station. During this incident, the Plaintiff pushed an EKG machine against a wall. The following day, Lamas, Chernys and Shobaken met with the Plaintiff and advised her that if she wanted to keep her job she would have to take a leave of absence under the Family and Medical Leave Act ("FMLA") and obtain psychotherapy to address her inability to get along with others at the hospital. The Plaintiff was told to see Oeler, who in turn referred the Plaintiff for therapy to Demaris Gonzalez–Miller, a licensed psychiatric social worker. The Plaintiff agreed to this plan and began her leave on July 28, 1995. While she was on leave, Plaintiff was paid but only through the use of accrued benefit time.

The Plaintiff was allowed to return to work on August 22, 1995 on the condition that she would continue her psychotherapy with Miller and that she would meet with Oeller monthly.[4] During one of her sessions with Oeler, Oeler made a statement to the effect "Pat, don't you know you're Black?" The Plaintiff took this comment as a joke.

In September, 1995 the Plaintiff received a written performance evaluation that had been withheld since April 30, 1995. The evaluation generally reflected average or better than average scores in all areas of performance except those relating to personal interactions with coworkers, supervisors and patients. Further, Chernys stated in the evaluation, "Patricia is a good medical assistant in her technical quality. She needs to improve her interpersonal skills and accept the authority of supervisors and others when told to follow certain procedures established at the office." Apparently as a result of this evaluation, Plaintiff was awarded a retroactive pay increase.

On December 8, 1995 the Plaintiff was issued a written disciplinary action report for the improper handling of a patient's laboratory results. This report was signed by Dr. Lieberman, one of the cardiologists, and Chernys and did not recommend or impose any discipline except to state, "Pat must complete her work and assume responsibility of admitting her errors. Errors of this nature endanger the patients' well-being." The Plaintiff refused to sign the report stating that she intended to submit a rebuttal.[5]

---

3. The Plaintiff's testimony concerning the statement was impeached with her deposition testimony in which she testified that Shobaken had merely stated that whatever was going on with her and Braun would not be tolerated and that it was only her interpretation, based on the atmosphere at the meeting, that Shobaken was referring to the fact that she is Black and Braun is White. Nonetheless, for the purposes of this Order, the Court accepts Plaintiff's trial testimony as true. Also, it should be noted that the Plaintiff never testified at trial that she felt intimidated, degraded, humiliated or insulted by Sho-

baken's remark. See, Faragher v. City of Boca Raton, 111 F.3d 1530 (11th Cir.1997), cert. granted, —— U.S. ——, 118 S.Ct. 438, 139 L.Ed.2d 337 (1997).

4. Her therapy included attending a battered women's program.

5. After the December 8, 1995 disciplinary action report no further disciplinary action was taken against the Plaintiff during the remaining course of her employment with the Defendant.

During February, 1996 the Plaintiff's duties were curtailed to the extent that she was limited to opening the laboratory and escorting patients to the examining rooms. On February 23, 1996, the Plaintiff filed her EEOC charge claiming that she had been subjected to a hostile work environment. After she filed the charge, most, if not all of her duties were restored and the atmosphere became friendlier. However, Plaintiff also claims that during this period, she overheard Chernys tell one of the physicians, in some unspecified context, not to "say anything else" to her. The Plaintiff resigned on March 27, 1996 effective April 10, 1996. To paraphrase her trial testimony, she resigned because she was unable to get the physicians and staff to work consistently with her.[6]

With respect to the treatment of others in the cardiology department, the only evidence presented was that of Jose Hernandez, and he testified that all of the employees in the cardiology department were harassed or badly treated.[7] With respect the treatment of others having or suspected of having interracial relationships at the hospital, the only evidence was the Plaintiff's testimony that no other Black/White relationships existed or were suspected to exist at Mt. Sinai, but that Mt. Sinai appeared to tolerate a relationship between an African–American employee and a Hispanic employee in the business office.

### LEGAL STANDARD

Rule 50, *Fed.R.Civ.P.*, provides:

(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

In considering a motion for judgment as a matter of law, all evidence and all reasonable inferences from the evidence must be considered in the light most favorable to the non-moving party. The motion can be granted only if the facts and inferences are so strong that the court believes that reasonable persons in the exercise of impartial judgment could not arrive at a contrary verdict. If, however, the evidence allows reasonable persons to reach different conclusions, the district court should deny the motion. *Oxford Furniture Companies v. Drexel Heritage Furnishings, Inc.*, 984 F.2d 1118, 1122 (11th Cir.1993).

### LEGAL ANALYSIS

*a. Hostile Work Environment*

■ In *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court recognized that "hostile environment" harassment motivated by a discriminatory animus is actionable under Title VII. In *Harris v. Forklift Systems*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court sought to explain the parameters of such a claim. As stated by the Supreme Court in *Harris*, "when the workplace is permeated with 'discriminatory intimidation, ridicule and insult' [citation omitted], that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, [citation omitted], Title VII is violated." *Id.* at 21, 114 S.Ct. 367. The Supreme Court further explained in *Harris* that a hostile work environment cannot be identified by a "mathematically precise test," but rather must be determined from the totality of the circumstances taking into consideration such factors as the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance and whether it unreasonably interferes with an

---

6. Her actual testimony on redirect was as follows:

Q. [By Plaintiff's counsel] What prompted you to quit, or what prompted you to tender your resignation?

A. Because I was unable to get consistent. Everyone, the physicians and everyone, to work consistently with me, as I had previously in the past and helping take care of the patients. I had—[whereupon another question was asked]

7. Apart from Hernandez, the only witnesses who testified in the Plaintiff's case-in-chief were the Plaintiff and licensed psychiatric social worker Demaris Gonzalez–Miller.

employee's work performance. *Id.* at 22–23, 114 S.Ct. 367.

■ Since *Harris*, the Eleventh Circuit Court of Appeals has held that the elements necessary to establish a race-based hostile work environment claim are: (1) the complainant belongs to a protected group; (2) the complainant was subjected to unwelcome racial harassment; (3) the harassment complained of was based, at least in part, upon membership in the protected class; and (4) the harassment complained of affected a condition of the complainant's employment. *Fleming v. Boeing Company*, 120 F.3d 242 (11th Cir.1997); *Cross v. State of Alabama*, 49 F.3d 1490 (11th Cir.1995), *reh'g denied*, 59 F.3d 1248 (11th Cir.1995) (No. 92–7005). Although the Eleventh Circuit has not further delineated the severity of conduct that would constitute harassment, other Courts of Appeal have taken the position that isolated incidents and mere unpleasantness will not support a hostile work environment claim; rather the offensive conduct must be, in the words of *Harris*, "severe and pervasive." *See e.g. Drake v. Minnesota Mining & Manufacturing Co.*, 134 F.3d 878 (7th Cir.1998); *Witt v. Roadway Express*, 136 F.3d 1424 (10th Cir.1998). With respect to assessing whether the allegedly offensive conduct is actionable, the Eleventh Circuit has emphasized, consistent with *Harris*, "The harassing conduct must create both an objectively hostile or abusive environment—one 'that a reasonable person would find hostile or abusive'—and a subjectively hostile or abusive environment—one that 'the victim . . . subjectively perceive[s] . . . to be abusive.'" *Fleming*, 120 F.3d at 35, *quoting Harris*, 510 U.S. at 21–22, 114 S.Ct. 367.

■ In this case the Plaintiff claimed that her work environment became hostile after September, 1994 and continued to be hostile until her resignation in April, 1996. Further, she attributed the hostility to suspicions among her supervisors that she was having or pursuing having an interracial relationship with Braun. Consistent with this contention, at trial the Plaintiff subjectively attributed every instance of discipline and every other unpleasantness at work after September, 1994 to racial animus. What was lacking, however, from the evidence presented in the Plaintiff's case-in-chief was any objective evidence that would satisfy the second prong of Plaintiff's prima facie case, i.e. that the Plaintiff was subjected to unwelcome racial harassment.

■ To be precise, the only evidence in the record reflecting that the Plaintiff's race was even a factor in her employment consisted of the statement she attributed to Shobaken at the April 21, 1995 meeting and the statement she attributed to Oeler during one of the counseling sessions. Oeler's statement, "Pat, don't you know you're black?" viewed objectively, is simply not racially offensive and no ·reasonable juror could find otherwise. *See, Fleming*, 120 F.3d at 245; *Watkins v. Bowden*, 105 F.3d 1344, 1351 (11th Cir.1997). In fact, even the Plaintiff thought Oeler was joking. Shobaken's statement, assuming a reasonable juror could find it to be sufficiently racially offensive to be actionable, was made during a private meeting with Chernys and the Plaintiff.[8] There is no evidence that it was ever repeated to anyone else, and in particular there is no evidence that Oeler or any of the individuals who complained about the Plaintiff's conduct at work (Rosa, Lieberman, and the receptionists involved in the April 4, 1995 incident) were aware of the statement or even of the rumors concerning the Plaintiff's alleged relationship or pursuit of Braun. Under these circumstances, no reasonable juror could find that the single statement attributed to Shobaken, and not repeated to anyone else, transformed the Plaintiff's employment during the relevant time period into a racially hostile work environment.[9] *Compare, E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir.1990) (racial slurs allegedly spoken by co-workers had to be so commonplace, overt and denigrating that they created an atmosphere charged with racial hostility).

---

8. *See,* footnote 3, *supra.*

9. *Harris* strongly suggests that "a mere offensive utterance", that is an utterance that is not "phys-

ically threatening or humiliating," is not actionable under the umbrella of "hostile work environment" claims. *Harris*, 510 U.S. at 23, 114 S.Ct. 367.

In reaching this conclusion, the undersigned has considered the fact that Chernys, as well as the complainants, signed each of the written disciplinary action reports, that Chernys authored the September, 1995 performance evaluation, and that Chernys was present at the April 21, 1995 meeting when the allegedly racially offensive statement was made by Shobaken. However, there is no objective evidence in the record to suggest that Chernys agreed with Shobaken or acted in conformity with Shobaken's position when issuing the reprimands. Thus, had the case been submitted to the jury, there would have been no objective evidentiary basis which would have permitted it to recharacterize Chernys's apparently race-neutral actions as actionable.

The Court also notes that although not expressly articulated by the Eleventh Circuit as part of the Plaintiff's prima facie case, the Plaintiff was still required by *Harris* and *Meritor* to produce evidence that would support the conclusion that the racial harassment was objectively "severe and pervasive." [10] *See, Fleming,* 120 F.3d at 246; *see also, Witt v. Roadway Express,* 136 F.3d 1424 (10th Cir.1998) In this case, as explained above, all the Plaintiff could prove was one incident of discipline that had no immediate consequence during which one arguably racially offensive remark was made and a handful of other incidents of discipline or disagreements over an approximate twelve month period which were racially neutral on their face. *See, Witt,* 136 F.3d at 1432 (two racial comments over a two year period legally insufficient to prove hostile work environment claim). Moreover, Jose Hernandez, a witness called by the Plaintiff, testified without contradiction that everyone in the cardiology department was harassed. Also noteworthy is the fact that except for being required to utilize her leave time and suffering a curtailment in her duties for a brief period, the Plaintiff suffered no tangible detriments as a result of any of the incidents. In fact she received a retroactive raise and was the beneficiary of extensive efforts to assist her in resolving her personal problems associated with her abusive marriage.

The totality of this evidence, giving the Plaintiff the benefit of all reasonable inferences in her favor, may show that the Plaintiff's working conditions after September, 1994 were more difficult and disagreeable than before. However, it does not demonstrate at an objective level that the Plaintiff was working in an atmosphere in which racial disparagement was commonplace or in which she could reasonably expect to be humiliated or insulted because of her race. Thus, in the assessment of the undersigned, the evidence produced by the Plaintiff was legally insufficient to allow the conclusion that Plaintiff had been subjected to conduct "sufficiently severe or pervasive 'to alter the conditions of employment and create an abusive working environment.'" *Meritor,* 477 U.S. at 67, 106 S.Ct. 2399 (*quoting Henson v. Dundee,* 682 F.2d 897, 904 (11th Cir.1982)).

### b. Constructive Discharge

■ A constructive discharge occurs when an employer makes an employee's working conditions so intolerable and unbearable because of his or her protected status that a reasonable person in that employee's position would have felt compelled to resign. *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311 (11th Cir.1989). Thus, a plaintiff claiming constructive discharge must show more than just a Title VII violation by her employer. *Coffman v. Tracker Marine, L.P.,* 141 F.3d 1241 (8th Cir.1998); *Tidwell v. Meyer's Bakeries, Inc.,* 93 F.3d 490, 495 (8th Cir.1996) (holding that although there was evidence of discrimination based on race, there was insufficient evidence to support a finding of constructive discharge); *Drake v. Minnesota Mining & Manufacturing Co.,* 134 F.3d 878 (7th Cir.1998) (more than ordinary discrimination is necessary to establish a constructive discharge claim) Also, whether the working conditions were sufficiently intolerable to amount to a constructive discharge is judged by an objective standard, not the employees' subjective feelings. *Gart-*

---

**10.** In *Watkins v. Bowden,* 105 F.3d 1344 (11th Cir.1997) the Eleventh Circuit equated the requirement that the plaintiff prove that the harassment was "severe and pervasive" with the fourth element of a hostile work environment claim, *i.e.* that the harassment complained of affected a term or condition of employment.

*man v. Gencorp, Inc.,* 120 F.3d 127, 130 (8th Cir.1997).

In this case, no reasonable juror could have found, based on the objective evidence, that the Plaintiff was forced to resign in April, 1996, let alone forced to resign at that time because of racially discriminatory conduct. As explained above, the evidence was undisputed that during the eight months following her return from her FMLA leave the Plaintiff received a retroactive raise and was subjected to written discipline only once as a result of a complaint by a physician concerning her handling of lab results. As to this incident of written discipline, the Plaintiff did not contend that the physician who initiated the complaint was racially motivated nor did she contest that the underlying incident occurred. Importantly, the Plaintiff testified that after she filed her EEOC charge in February, her duties were restored and the atmosphere became friendlier.[11]

The Court recognizes that the Plaintiff also testified that she felt singled out at a January, 1996 meeting that was held with all the medical assistants to reprove them for their performance because Dr. Lieberman was looking at her when he was speaking, because she was advised in writing not to call patients from home to remind them of laboratory appointments contrary to hospital policy, and because she overheard Chernys tell one of the doctors not to "say anything else" to her. However, as noted above, Hernandez testified without contradiction that everyone in the cardiology department was treated badly and, in any event, the Plaintiff's subjective feelings that these events were the product of racial animus are simply insufficient under the law to support the conclusion that she was being discriminated against because of her race. *See, Carter v. Ball,* 33 F.3d 450, 459 (4th Cir.1994) (a feeling of being unfairly criticized or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign). Further, even if such an inference legally could be made, no reasonable juror could have been

able to conclude based on the totality of the circumstances as they existed at the time of the Plaintiff's resignation, that her working conditions were so intolerable because she was Black that a reasonable person in her position would have felt compelled to resign.

Accordingly, it is hereby

ORDERED AND ADJUDGED that the Defendant's Motion For Entry of Judgment As A Matter Of Law is hereby granted.[12]

---

11. The Plaintiff did not assert a retaliation claim.

12. The elements of a racially hostile work environment claim and a constructive discharge claim under 42 U.S.C. § 1981 are the same as

under Title VII. *See Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999 (11th Cir.1997). Therefore, the analysis contained in this order is intended to apply to both counts of the Plaintiff's complaint.