**John B. NIXON, Jr., Plaintiff,**

v.

**LIFE INSURANCE COMPANY OF NORTH AMERICA and Health-South Corporation, Defendants.**

**No. CIV. A. 97–T–1704–N.**

United States District Court,
M.D. Alabama,
Northern Division.

Jan. 23, 2001.

---

G. Houston Howard, II, Howard, Dunn, Howard & Howard, Wetumpka, AL, for Plaintiff.

Kurt A. Powell, Thomas E. O'Connor, Jr., Hunton & Williams, Atlanta, GA, Jarred O. Taylor, II, William Bernhart Wahlheim, Jr., Maynard, Cooper & Gale, P.C., Birmingham, AL, Joseph C. Espy, III, A. Lester (Les) Hayes, III, Melton, Espy, Williams & Hayes, P.C., Montgomery, AL, for Defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff John B. Nixon, Jr. filed this lawsuit in state court under the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. §§ 1001–1461, commonly known as 'ERISA,' against defendants Life Insurance Company of North America (LINA) and HealthSouth Corporation. Nixon seeks to recover benefits allegedly due him under an employee welfare benefit plan. HealthSouth later filed a cross-claim against LINA. Invoking the court's federal-question jurisdiction, LINA and HealthSouth removed this lawsuit to this court under 28 U.S.C.A. § 1441(b).

By agreement of the parties, this lawsuit has been submitted to the court for final judgment on the pleadings, the jointly-submitted evidentiary record, and the parties' briefs. Two motions are also pending: Nixon's motion to strike LINA's affirmative defense of pre-existing illness; and Nixon's motion to strike an affidavit. For the reasons that follow, the court will deny Nixon's motions, find in favor of LINA and HealthSouth on Nixon's claims against

them, and deny HealthSouth's cross-claim as moot.

## I.  FACTUAL SUMMARY

On January 22, 1996, HealthSouth hired Nixon as a truck driver.[1]  Although it paid him for 40 hours of work a week,[2] the company characterized the position as an "exempt," that is, salaried rather than hour-based.[3]  As such, HealthSouth did not maintain attendance records on Nixon or require him to punch a time clock.[4]  Nixon understood that, as a truck driver, he would have *up time* when, for example, he could work for three months with hours that greatly exceeded 40 per week, and then have *down time* with three months off doing light or limited work, but with the result that his average time and pay would, over time, be comparable to 40 hours per week.[5]  And, although the company did not maintain a formal job description for the job,[6] the parties agree that Nixon was hired as a truck driver,[7] and, more specifically Nixon and Health-South understood that the position would require Nixon to drive an 18–wheel truck to and from HealthSouth's roadshows, assist with the roadshows, load and unload the truck, and be away from home for up to three months at a time.[8]

Also on January 22, 1996, Nixon attended HealthSouth's mandatory new-employee orientation.[9]  At the orientation, Nixon received a packet of information that included HealthSouth's employee handbook and a booklet describing HealthSouth's employee benefit plan.[10]  At that time, HealthSouth's long-term disability insurance plan was with Metropolitan Life Insurance Company.[11]

From his date of hire on January 22, 1996, until March 2, 1996, Nixon's sole work for HealthSouth was as follows:  one two-day trip driving a truck full of band equipment from Atlanta, Georgia to Birmingham, Alabama;[12]  one trip driving a truck to somewhere in Florida to pick up a laser light bulb;[13]  one three- or four-day trip driving a tractor trailer from Birmingham to Orlando, Florida;[14]  and otherwise wearing a beeper and responding to telephone calls.[15]

On March 2, 1996, approximately six weeks after beginning his employment with HealthSouth, Nixon suffered a heart attack and underwent cardiac catherization and angioplasty;[16]  he remained hospitalized four days.[17]  Dr. Michael Salvia noted in his written discharge instructions that Nixon could return to work in six weeks.[18]

**1.**  *See* Deposition of Angela Lee Houston at 114;  Deposition of Plaintiff at 24.

**2.**  *See* Record, exhibit PX H9.

**3.**  *See* Deposition of Angela Lee Houston at 105.

**4.**  *See* Deposition of Angela Lee Houston at 14–16, 50.

**5.**  Deposition of Plaintiff at 68–69.

**6.**  *See id.* at 45;  LINA's brief, filed May 22, 1998, at 4.

**7.**  *See* Plaintiff's brief, filed May 8, 1998, at 1;  LINA's brief, filed May 22, 1998, at 1.

**8.**  *See* Plaintiff's brief, filed May 8, 1998, at 1;  Deposition of Plaintiff at 68–69, 84;  Record, exhibit PX L1 at 34;  LINA's brief, filed May 22, 1998, at 4.

**9.**  *See* Deposition of Angela Lee Houston at 85–86;  Deposition of Plaintiff at 166–67

**10.**  *See* Plaintiff's brief, filed May 8, 1998, at 2;  Deposition of Angela Lee Houston at 85–86;  Deposition of Plaintiff at 98, 152, 165;  Record, exhibit DX HS2.

**11.**  *See* Deposition of Angela Lee Houston at 42–43, 93–94.

**12.**  *See* Deposition of Plaintiff at 25–26.

**13.**  *See id.* at 43.

**14.**  *See id.* at 26.

**15.**  *See id.* at 26–27.

**16.**  *See* Record, exhibit PX L1 at 46.

**17.**  *See id.*

**18.**  *See id.* at 144, 167.

The following month, effective April 1, 1996, HealthSouth changed its long-term disability insurance carrier from Metropolitan Life to LINA.[19]

Later that month, on April 30, 1996, less than two months after suffering his first heart attack, Nixon was hospitalized for congestive heart failure,[20] and he remained hospitalized until May 3, 1996.[21] After Nixon's second hospitalization, Dr. Richard Eric Crum noted in his discharge summary that Nixon should "resume his activities slowly." [22]

The following month, Nixon was hospitalized on two separate occasions. On June 3 or 4, 1996, he suffered another heart attack and underwent cardiac catherization and angioplasty;[23] he was released four days later.[24] On June 20, 1996, he was hospitalized again for congestive heart failure;[25] he was released on June 22, 1996.[26]

After his first heart attack on March 2, 1996, Nixon never again drove a truck for HealthSouth because of his health.[27] However, he remained employed by the company through approximately July 26, 1996.[28]

After March 2, 1996, and before his employment with HealthSouth ended in late July 1996, Nixon's work was essentially restricted to the light duty work and short hours he would have done during the down time between truck-driving assignments. He performed the following: wore his beeper and, through early or mid-July 1996, received approximately four calls per week from HealthSouth employees to discuss company roadshows;[29] attended a three-hour meeting in Birmingham in April, May, or June 1996, where set designs for the roadshow were discussed;[30] on two or three occasions, road as a passenger in a truck driven by a HealthSouth employee to pick up tie-downs and tire cleaner in Montgomery, Alabama;[31] and, in or around May 1996, road in a pickup truck to Montgomery with another HealthSouth employee to pick up a truck part.[32]

On August 7, 1996, HealthSouth notified Nixon that his employment was terminated.[33]

Seven months later, on March 14, 1997, Nixon submitted a claim for long-term-disability benefits to HealthSouth.[34] HealthSouth forwarded Nixon's claim to LINA.[35] On Nixon's claim form, HealthSouth indicated that Nixon's "last date[ ] worked" was March 2, 1996,[36] that Nixon's "salary [was not] continued beyond the last day worked," and that the "effective date of [Nixon's long-term-disability] coverage" was either April 1, 1996, or July 1, 1996.[37]

In a letter dated May 15, 1997, Noy Baccum, a senior benefit analyst at LINA,

---

**19.** *See id.,* exhibit PX H4; Deposition of Angela Lee Houston at 93–94.

**20.** *See* Record, exhibit PX L1 at 59.

**21.** *See id.*

**22.** *Id.* at 60.

**23.** *See id.* at 65.

**24.** *See id.*

**25.** *See id.* at 87.

**26.** *See id.*

**27.** *See* Deposition of Plaintiff at 44.

**28.** *See* Deposition of Angela Lee Houston at 58–59.

**29.** *See* Deposition of Plaintiff at 37–38.

**30.** *See id.* at 30–31.

**31.** *See id.* at 35–37.

**32.** *See id.* at 57–58. HealthSouth's records do not show, however, that Nixon submitted an expense report after March 2, 1996. *See* Deposition of Angela Lee Houston at 105–06.

**33.** *See* Plaintiff's brief, filed May 8, 1998, at 6; Record, exhibit PX 28

**34.** *See* Record, exhibit PX H3.

**35.** *See id.,* exhibit PX L1 at 244.

**36.** *See id.,* exhibit PX L2; Deposition of Angela Lee Houston at 18.

**37.** *See* Record, exhibits PX L2, PX H3.

informed Nixon that LINA denied his claim for long-term-disability benefits.[38] The letter stated:

"Policy LK 8305, HealthSouth Corp., became effective 4/1/96. Based on the claim form, your last day worked was 3/2/96. In view that you went out on disability prior to the policy effective date, you do not have have [sic] coverage under the above policy. Therefore, you will not be eligible for long term disability benefits." [39]

The next month, on June 10, 1997, Nixon submitted an appeal of the denial of his claim to both HealthSouth and LINA.[40] Along with each of his letters of appeal, Nixon submitted a copy of the following: Dr. Salvia's March 6, 1996, discharge instructions stating that Nixon could return to work in six weeks; a note from Dr. Salvia dated April 16, 1997, stating that Nixon was disabled as of August 1, 1996; and a copy of Nixon's final paycheck from HealthSouth, showing that Nixon was paid through August 3, 1996.[41]

Thereafter, in a letter dated September 15, 1997, Baccum informed Nixon that LINA denied his appeal.[42] Baccum's letter explained:

"The HealthSouth Long Term Disability Plan has a 6 months Eligibility Waiting Period in order to qualify for coverage. Since your date of hire was 1/22/96, your effective date of coverage would have been 7/22/96 if you continue to work full time until 7/22/96. Your Employer has informed us that your physical last day worked was 3/2/96 and you have not returned to work full time at full capacity since 3/2/96. The effective of coverage [sic] will be extended by the number of days you were not in Active Service. Salary continuance beyond the last day worked does not take place or qualify as Active Service which cannot be counted toward your Eligibility Waiting Period.

In essence, you do not have coverage as Eligibility Waiting Period has not been satisfied." [43]

The next month, on October 21, 1997, Nixon filed a lawsuit in an Alabama state court against LINA, HealthSouth, and Cigna Corporation, asserting several state-law claims related to the denial of his claim for long-term-disability benefits under the LINA plan. On December 5, 1997, HealthSouth, later joined by LINA, removed Nixon's lawsuit to this federal court based on federal-question jurisdiction asserting that Nixon's state-law claims are 'superpreempted' by ERISA.

By order dated January 26, 1998, this court granted LINA's motion to dismiss Cigna as a defendant. In that order, the court also found that the LINA plan is an ERISA plan, and the court, therefore, dismissed Nixon's state-law claims and directed this lawsuit to proceed as an ERISA lawsuit exclusively.

Also, on January 26, 1998, Nixon filed an amended complaint, asserting ERISA claims against LINA for breach of fiduciary duty or wrongful denial of benefits, and willful or wanton breach of fiduciary duty or denial of benefits. Nixon asserts ERISA claims against HealthSouth for breach of fiduciary duty, willful or wanton breach of fiduciary duty, and estoppel.

The following month, on February 5, 1998, HealthSouth filed a cross-claim against LINA for indemnification and contribution should HealthSouth be found liable to Nixon.

Finally, on May 8, 1998, Nixon filed a motion to strike LINA's affirmative defense of pre-existing illness and a motion to strike an affidavit of Noy Baccum submitted by LINA.

---

**38.** *See id.*, exhibit PX L1 at 263.

**39.** *Id.*

**40.** *See id.* at 231–39, 242–46.

**41.** *See id.* at 231–39.

**42.** *See id.* at 32–33.

**43.** *Id.* at 33.

## II. PENDING MOTIONS

### A. *Nixon's Motion to Strike Affirmative · Defense of Pre–Existing Illness*

Nixon moves to strike LINA's affirmative defense that his claim is barred by the LINA plan's pre-existing-condition-limitation clause. Nixon reasons that, although LINA pleaded the pre-existing-limitation defense in its answer to his amended complaint, LINA did not file that answer until April 22, 1998, two days before the court imposed deadline for submitting the joint record and after Nixon had completed discovery from LINA.[44] Therefore, Nixon argues, LINA has waived the affirmative defense and he was prejudiced by LINA's untimely assertion of the defense.[45]

LINA disagrees. LINA contends that its pre-existing-limitation defense is not an affirmative defense under Federal Rule of Civil Procedure Rule 8(c) and, therefore, it did not need to be pleaded affirmatively.[46] Alternatively, LINA argues that, even if its assertion of the pre-existing-condition limitation is an affirmative defense, Nixon was aware of the LINA plan's pre-existing-condition-limitation clause before he filed this lawsuit and, therefore, he was not prejudiced by LINA's untimely assertion of the defense.[47]

Rule 8(c) states,

"a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense."

Rule 8(c) does not expressly enumerate as an affirmative defense a pre-existing-condition limitation in an insurance contract. Nixon, however, contends that the defense falls within the Rule's residual clause— "any other matter constituting an avoidance or affirmative defense." [48]

The Eleventh Circuit Court of Appeals has defined an affirmative defense as " '[a]ny matter that does not tend to controvert the opposing party's *prima facie* case as determined by the applicable case law.' " *Hassan v. United States Postal Serv.*, 842 F.2d 260, 263 (11th Cir.1988) (quoting 2A J. Moore, et al., Moore's Federal Practice ¶ 8.27[3] (2d ed.1985)). To determine whether an argument is an affirmative defense the court should consider " 'the logical relationship between the defense and the cause of action,' and the likelihood that the plaintiff will be unfairly surprised if the defense does not appear in the pleadings." *Id.* (quoting *Ingraham v. United States*, 808 F.2d 1075, 1079 (5th Cir.1987)).

In *Hassan,* the appellant argued that the trial court erred in considering evidence of collateral-source payments that the government failed to plead as an affirmative defense in a case brought under the Federal Torts Claims Act, 28 U.S.C.A. §§ 1346, 2671–80. *See* 842 F.2d at 261–62. The appellant contended that the government's collateral-source-payments argument is an affirmative defense that should have been raised in the pleadings. *See id.* at 262. According to the appellant, because the government did not raise the argument in its pleadings it waived its right to raise the argument at trial. *See id.* The Eleventh Circuit agreed that the government's collateral-source-payments argument is an affirmative defense under

---

44. *See* Plaintiff's motion to strike LINA's affirmative defense of pre-existing illness, filed May 8, 1998, ¶¶ 5–8.

45. *See id.* ¶¶ 10–12.

46. *See* LINA's opposition to Plaintiff's motion to strike LINA's affirmative defense of pre-existing illness, filed June 1, 1998, ¶¶ 4–6.

47. *See id.* ¶¶ 7–13.

48. *See* Plaintiff's motion to strike LINA's affirmative defense of pre-existing illness, filed May 8, 1998, ¶ 8.

Rule 8(c). *See id.* at 263. The appellate court reasoned:

> "[T]he government argued that its liability should be reduced by the amount of social security and insurance payments Hassan received. This introduced an issue not directly related to its liability in the automobile accident—the real subject of the litigation. Evidence about the collateral source payments is distinct from evidence about the accident and evidence about the physical and emotional damage borne by [the appellant]. Therefore, we conclude that the collateral source payments argument falls within the scope of Rule 8(c), and that the government erred in not including this issue in the pleadings as an affirmative defense."

*Id.*

■ In Nixon's case, the evidence relevant to LINA's pre-existing-condition argument is not directly related to the real subject of the litigation. Like the evidence of collateral-source payments in *Hassan,* evidence of whether Nixon's disability was caused by a condition that arose during the time frame that will cause it to be a pre-existing condition under the LINA plan is distinct from evidence of if and when Nixon was *prima facie* ever eligible for benefits under the LINA plan. In other words, a pre-existing-condition limitation is not ordinarily something a plaintiff would show in order to prevail; rather it is something a defendant would show and can, indeed, waive if it elects not to pursue it.

Although the *Hassan* court concluded that the government's collateral-source-payments argument was an affirmative defense without discussing what the court had earlier stated is the second relevant factor in determining whether an argument is an affirmative defense—that is, the likelihood that the plaintiff will be unfairly surprised if the defense does not appear in the pleadings—this court will subject LINA's pre-existing condition limitation argument to that prong of the analysis as well. This test, the court believes, is an objective, not a subjective, one. The question is whether, as a general proposition, plaintiffs would be prejudiced if the defense did not appear in a pleading in a timely manner. (Whether Nixon was, in fact, prejudiced—a subjective question discussed later—goes to whether the failure to assert the defense in a timely manner should be waived.) The court believes that plaintiffs would be so prejudiced. A pre-existing-condition limitation, as stated, is not something a plaintiff would show in order to prevail; rather it is something a defendant can waive if it elects not to pursue it. Thus, unless and until a defendant asserts the defense, the plaintiff can reasonably assume, and rely on the assumption, that the defendant, for whatever reason, has decided not to pursue it; and it would be objectively reasonable to assume that the failure of the defendant to raise the defense in a timely manner could prejudice a plaintiff who had so reasonably relied. The court therefore concludes that it is an affirmative defense under Rule 8(c).[49]

Under Federal Rule of Civil Procedure 15(a), a party generally must respond to an amended pleading within the longer of

---

**49.** To be sure, LINA in its answer asserted the pre-existing-condition clause to be an affirmative defense; however, this fact in and of itself does not estop LINA from making the argument that the defense is not an affirmative defense subject to Rule 8(c). As professors Wright and Miller teach regarding Rule 8(c),

> "[A] pleader, in order to avoid waiving an otherwise valid defense, often will decide to set up affirmatively matter that technically may not be an affirmative defense but nonetheless might fall within the residuary clause of Rule 8(c).... To minimize the problems raised by the uncertain range of the residual clause in Rule 8(c), it is advisable for defendant to allege affirmatively any new matter that he believes may not be embraced by the pleadings.... [A] defendant will not be penalized for doing so and he will have the advantage of immunizing himself against a possible waiver of the defense."

5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure §§ 1270–71 (2d ed.1990).

either the time remaining for response to the original pleading or 10 days after service of the amended pleading. *See* Fed. R.Civ.P. 15(a). Nixon contends that LINA's pre-existing-condition-affirmative defense is untimely asserted because he filed his amended complaint on January 26, 1998, and yet LINA did not file its answer to his amended complaint (in which it first alleged the pre-existing-condition limitation as an affirmative defense) until almost three months later.[50]

■ The general rule is that when a party fails to raise an affirmative defense in the pleadings, that party waives its right to raise the issue at trial. *See Hassan*, 842 F.2d at 263 (citing *American Nat'l Bank v. Federal Deposit Ins. Corp.*, 710 F.2d 1528, 1537 (11th Cir.1983)). "However, the liberal pleading rules established by the Federal Rules of Civil Procedure apply to the pleading of affirmative defenses. [Courts] must avoid hypertechnicality in pleading requirements and focus, instead, on enforcing the actual purpose of the rule." *Id.*

■ The purpose of Rule 8(c) is to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that he or she is prepared to litigate it properly. *See Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797 (11th Cir.1989); *Hassan*, 842 F.2d at 263. "When a plaintiff has notice that an affirmative defense will be raised at trial, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice." *Id.* at 263. And, thus, "when the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for the trial court to hear evidence on the issue." *Id.; see also Grant*, 885 F.2d at 797 (stating that where a plaintiff received notice of an affirmative defense by some means other than pleadings the defendant's failure to comply with Rule 8(c) does not prejudice the plaintiff).

In *Hassan*, the appellate court determined that there was no prejudice to the appellant and thus the trial court did not err by failing to consider the government's affirmative defense of collateral-source payments even though the government did not plead it as an affirmative defense. *See* 842 F.2d at 263–64. The appellate court reasoned that long before trial the government deposed the appellant and questioned her extensively about the collateral-source payments she received and, earlier, the government asked the appellant about the collateral-source payments in an interrogatory. *See id.*

■ Similarly, here, while LINA did not plead the LINA plan's preexisting-condition limitation as an affirmative defense in a timely manner, Nixon has not been prejudiced. To be sure, LINA first pled the defense on April 22, 1998, after Nixon had completed discovery with LINA and two days before the deadline imposed by the court for the parties to submit a joint record. However, prior to the date Nixon filed his original lawsuit in state court, in a letter dated June 20, 1997, Baccum informed Nixon's counsel of the following:

"If the incurred date of disability is determined to be after the effective [sic], there will be a preexisting investigation. The investigation period will be 3 months prior to the effective date of coverage. Please refer to the certificate for more information on preexisting condition limitation. This particular issue has been discussed with Mr. Nixon several weeks back and he indicated that he understood the language well." [51]

Similarly, at his deposition on April 24, 1998, Nixon indicated in his testimony that he was aware of and understood the significance of the LINA plan's pre-existing-condition clause before he filed his original lawsuit:

"Q. Did you ever have any conversations with Ms. Baccum or anyone

---

50. *See* Plaintiff's motion to strike LINA's affirmative defense of pre-existing illness, filed May 8, 1998, ¶¶ 5, 6, 10.

51. Record, exhibit PX L1 at 229.

at LINA regarding the pre-existing condition limitation?

"A. Right.

"Q. You did have?

"A. Right.

"Q. And tell me the substance of those conversations.

"A. I told Ms. Baccum—she said that if everything else passed, they would still have to do a preexisting . . . .

. . .

"Q. But did you know that there was that condition limitation in this policy?

"A. I knew that she said that if I passed everything else, I would have to go through a preexisting check.

"Q. So she advised you of that?

"A. Right.

. . .

"Q. And you understood the significance of a preexisting condition?

"A. Right." [52]

Nixon's testimony shows that he knew of the LINA plan's pre-existing-condition-limitation clause and he understood that, only if his claim met all other policy requirements, would LINA then assert this defense, and he knew this several months before LINA alleged it as an affirmative defense in its answer to Nixon's amended complaint, several months before Nixon closed discovery with LINA, and several months before the joint record was due to be submitted; moreover, Nixon has not identified any specific discovery or evidence that he does not already have and that he would have sought but did not. Nixon, accordingly, was not unfairly surprised by the affirmative defense when it was asserted by LINA in its April 22, 1998, answer to Nixon's amended complaint. Therefore, the court finds that LINA's assertion of the LINA plan's pre-existing condition limitation as an affirmative defense for the first time on April 22, 1998, did not prejudice Nixon. *See Grant,* 885 F.2d at 797–98 (holding that the district court did not err by addressing the merits of the defendant's statute of limitations defense, even though defendant failed to plead it as required by Rule 8(c), where the defendant raised the defense in a motion for summary judgment approximately one month before trial and the plaintiff was fully aware that the defendant intended to rely on the defense); *Hassan,* 842 F.2d at 263–64.

Nixon relies on *American National Bank of Jacksonville v. Federal Deposit Insurance Corporation,* 710 F.2d 1528 (11th Cir.1983), and *Oxford Furniture Companies, Inc. v. Drexel Heritage Furnishings, Inc.,* 984 F.2d 1118 (11th Cir. 1993), for the proposition that LINA waived its right to assert the pre-existing-condition clause as an affirmative defense by failing to assert it in a timely fashion.[53] Neither case is helpful to Nixon, however. In *American National,* the Eleventh Circuit held that the appellant waived its right to advance the statute-of-limitations defense by its failure to assert the defense in any pleading in compliance with Rule 8(c). *See* 710 F.2d at 1537. The appellant first raised the statute of limitations in its closing argument to the trial court. *See id.* n. 12. Unlike in the case at bar, where, as discussed, LINA's assertion of the pre-existing-condition clause as an affirmative defense in its answer to Nixon's amended complaint did not surprise or prejudice Nixon, it was reasonable to expect that the appellee-plaintiff in *American National* would be surprised by the appellant's assertion of the statute of limitations when it did not raise that defense in any pleading, but, instead, only in its closing argument.

Similarly, in *Oxford Furniture,* the Eleventh Circuit held that the district court did not abuse its discretion by deny-

---

**52.** Deposition of Plaintiff at 136, 138, 143–44.

**53.** Plaintiff's motion to strike LINA's affirmative defense of pre-existing illness, filed May 8, 1998, ¶ 10.

ing the appellant's motion to amend its answer to interject the statute of frauds as a defense. *See* 984 F.2d at 1124. In doing so, the appellate court reasoned that the appellant's motion to amend was filed ten months after the appellee's complaint and seven days before the pretrial conference and the appellant gave no reason for waiting to raise the statute of frauds defense. *See id.* The *Oxford Furniture* court's holding implies that the appellee would have been prejudiced if it had to address the statute-of-frauds defense for the first time so close to trial. Because, in the case at bar, Nixon is not prejudiced by LINA's preexisting condition defense, *Oxford Furniture* does not help Nixon here.

For these reasons, the court will deny Nixon's motion to strike LINA's affirmative defense of pre-existing illness.

### B. Nixon's Motion to Strike Affidavit of Noy Baccum

Nixon moves to strike the affidavit of Noy Baccum, which LINA filed on April 24, 1998, after Nixon's attorney deposed Baccum on April 14, 1998. Nixon argues that the affidavit includes testimony regarding the applicability of the LINA plan's pre-existing-condition clause to Nixon, information that had he known of at the time of Baccum's deposition he would have cross-examined Baccum about. Specifically, Nixon contends: "LINA's submission of an affidavit from Ms. Baccum, rather than questioning her during the deposition on the supposed defense, effectively deprived the plaintiff of his right to cross examine Ms. Baccum about an issue on which she appears to have no first hand knowledge;"[54] and "the submission of the affidavit of Ms. Baccum works substantial prejudice to the plaintiff in that the plaintiff's attorney traveled to Texas for the express purpose of deposing Ms. Baccum at great expense."[55]

In response, LINA contends that Baccum's affidavit does not prejudice Nixon because he knew of the LINA plan's pre-existing-condition clause at the time of Baccum's deposition and Baccum testified about that clause at her deposition.[56] Alternatively, LINA argues that none of the facts or arguments that it relies on to support its position on the merits of Nixon's lawsuit is dependent on Baccum's affidavit testimony, but all are, instead, verified by other parts of the record.[57]

Nixon specifically objects to two statements by Baccum in her affidavit: First, "even if Mr. Nixon is eligible for coverage under the policy as he claims, the pre-existing condition limitation would preclude long-term disability coverage for Mr. Nixon."[58] Second, "Mr. Nixon was not covered under a prior plan of Health-South."[59]

Nixon's counsel and Baccum had the following exchange at Baccum's deposition on April 14, 1998:

> "Q. Well, my question is simply this. Have you already made a determination as we sit here today that Mr. Nixon's claim was not payable because of the preexisting limitation clause in the policy?
>
> "A. First of all, we made a determination that he did not have coverage as of 4/1/96. Secondly, if their assumption was made that he worked through a certain period of time, then the records, based on the information that I have obtained so far, will in fact prove that this is a preexisting condition."[60]

---

**54.** Plaintiff's motion to strike affidavit of Noy Baccum, filed May 8, 1998, ¶ 8.

**55.** *Id.* ¶ 9.

**56.** *See* LINA's opposition to Plaintiff's motion to strike affidavit of Noy Baccum, filed June 1, 1998, ¶¶ 4–7.

**57.** *See id.* ¶ 3.

**58.** Plaintiff's motion to strike affidavit of Noy Baccum, filed May 8, 1998, ¶ 5.

**59.** *Id.* ¶ 6.

**60.** Deposition of Noy Saythongphet Baccum at 112.

The question posed by Nixon's counsel shows that, during Baccum's deposition, Nixon was aware of the pre-existing-condition clause in the LINA policy and how it might bar Nixon's claim to long-term-disability benefits. Furthermore, Baccum's response to that question placed Nixon on notice that, in Baccum's opinion, his claim would be barred by the pre-existing-condition limitation, even if Nixon were otherwise eligible for benefits under the LINA plan. Moreover, Nixon has not identified any specific discovery or evidence he would have elicited from Baccum or any one else that he does not already have or that is not already adequately developed in the record. Therefore, Nixon cannot reasonably argue that he will be prejudiced by Baccum's affidavit testimony that "even if Mr. Nixon is eligible for coverage under the policy as he claims, the pre-existing condition limitation would preclude long-term disability coverage for Mr. Nixon," and "Mr. Nixon was not covered under the prior plan of HealthSouth." Accordingly, the court will deny Nixon's motion to strike the Baccum affidavit.

## III. DISCUSSION OF THE MERITS OF THE LAWSUIT

### A. Nixon's Claims Against LINA

#### 1.

As a threshold matter, the court must determine the proper standard of review to apply to LINA's denial of long-term-disability benefits to Nixon.

The LINA plan does not identify the plan administrator.[61] Angela Lee Houston, HealthSouth's benefits coordinator,[62] testified that HealthSouth is the plan administrator.[63] However, both Houston and Baccum testified that LINA is, in fact, the plan administrator, at least to the extent that LINA has the sole authority to grant or deny claims under the LINA plan,[64] both Nixon and LINA agree in this litigation.[65] Therefore, the court will assume that LINA is the plan administrator, at least to the extent relevant to determining the standard of review to be applied to LINA's denial of Nixon's claim for benefits under the LINA plan.

■ ERISA does not provide a standard of review for decisions of a plan administrator. The Eleventh Circuit has, however, adopted standards for reviewing both the plan administrator's plan 'interpretation' and its 'factual determinations.' A plan administrator's interpretation of the plan is subject to the following standards of review: *de novo* review where the plan does not grant the administrator discretion; arbitrary-and-capricious standard of review where the plan grants the administrator discretion; and heightened arbitrary-and-capricious standard of review where the administrator has a conflict of interest. *See Buckley v. Metropolitan Life*, 115 F.3d 936, 939 (11th Cir.1997) (per curiam); *Cagle v. Bruner*, 112 F.3d 1510, 1516 (11th Cir.1997) (per curiam); *Marecek v. BellSouth Telecommunications, Inc.*, 49 F.3d 702, 705 (11th Cir.1995).

Regarding the plan administrator's factual determinations, in *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446 (11th Cir. 1997), the Eleventh Circuit held that, where the plan affords the administrator discretion, the administrator's factual determinations are reviewed under an arbitrary-and-capricious standard.[66]

The LINA plan does not expressly provide the plan administrator with discre-

---

61. *See* Record, exhibit PX H4.

62. *See* Deposition of Angela Lee Houston at 6–7.

63. *See id.* at 82.

64. *See id.* at 91; Deposition of Noy Saythongphet Baccum at 126–27.

65. *See* Plaintiff's brief, filed May 8, 1998, at 14; LINA's brief, filed May 22, 1998, at 15; HealthSouth's brief, filed May 22, 1998, at 11.

66. In *Lake v. UNUM Life Ins. Co. of Am.*, 50 F.Supp.2d 1243 (M.D.Ala.1999) (Thompson, J.), this court found that the heightened arbitrary-and-capricious standard is applicable to a plan administrator's factual determinations where there is a conflict of interest.

tionary authority to interpret the plan or make factual determinations.[67] Nevertheless, both Nixon and LINA agree that the court should review LINA's factual determinations under a *de novo* standard, and thus the court will abide by this agreement and review LINA's factual determinations *de novo.*[68] *Cf. Katz v. Comprehensive Plan of Group Ins.,* 197 F.3d 1084, 1089–90 (11th Cir.1999) (applying the *de novo* standard of review to the plan administrator's determination that the plan participant was not in 'active service,' a factual determination; the court, however, did not indicate whether the administrator had discretion under the plan).

Nixon contends that he was employed by HealthSouth from January 22, 1996, through late July or early August 1996, and otherwise satisfied the eligibility requirements necessary for him to receive long-term disability benefits under the LINA plan.[69] Therefore, according to Nixon, LINA wrongly denied his claim for benefits.[70]

LINA disagrees. LINA argues that Nixon is not eligible for long-term-disability benefits under the LINA plan because he was not in 'active service' with HealthSouth on April 1, 1996, the effective date of the LINA plan.[71] Alternatively, LINA argues that, even if Nixon was in 'active service' with HealthSouth on April 1, 1996, and, therefore, generally eligible for benefits, his claim for benefits is barred by the LINA plan's preexisting-condition-limitation clause.[72]

**2.**

According to the LINA plan, "[t]he insurance company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy."[73] Therefore, the relevant issues are when, if ever, was Nixon covered under the LINA plan and, if Nixon was covered under the LINA plan, whether he became disabled while covered.

The LINA plan provides that "[a]n Employee in one of the Classes of Eligible Employees shown in the Schedule of Benefits is eligible to be insured on the Policy Effective Date, or the day he or she completes the Eligibility Waiting Period, if later."[74] The LINA plan classifies eligible employees into two classes as follows:

"Class 1 All active Full-time permanent employees of the Policyholder regularly working at least 40 hours per week.

"Class 2 All active, grandfathered part-time employees with benefits at the time of the acquisition/merger, working less than 40 hours per week."[75]

The LINA plan does not impose an eligibility waiting period on employees hired before the "Policy Effective Date,"[76] which is April 1, 1996.[77] Because Nixon was hired by HealthSouth on January 22, 1996, he is not subject to an eligibility waiting period. Therefore, whether Nixon became eligible for insurance under the LINA plan on April 1, 1996, depends on whether he met all other relevant policy requirements.[78]

---

**67.** *See* Record, exhibit PX H4.

**68.** *See* Plaintiff's brief, filed May 8, 1998, at 14; LINA's brief, filed May 22, 1998, at 15. In any event, for the same reasons that the court upholds LINA's decision after a *de novo* review, it would also uphold the decision under the arbitrary-and-capricious standard.

**69.** *See* Plaintiff's brief, filed May 8, 1998, at 14–23.

**70.** *See id.*

**71.** *See* LINA's brief, filed May 22, 1998, at 15–22.

**72.** *See id.* at 22–31.

**73.** Record, exhibit PX H4 at 11.

**74.** *Id.* at 2.

**75.** *Id.* at 4.

**76.** *See id.* at 5.

**77.** *See id.* at cover page.

**78.** *See id.* at 2.

LINA contends that Nixon was not eligible for insurance on April 1, 1996, because he lost his eligible-employee status on March 2, 1996.[79]  According to LINA:

> "The overwhelming evidence in this case shows that Plaintiff suffered a dramatic loss of physical function after his first heart attack on March 2, 1996.  Rather than returning to work in six weeks as Dr. Salvia initially suggested, Plaintiff's physical condition continued to decline with three additional hospitalizations for heart failure in the three months that followed.  Plaintiff *never* again regained the ability to function as a truck driver at 100% capacity or return to work as a truck driver without restrictions *before and after the LINA LTD policy's effective date of April 1, 1996.*" [80]

In other words, LINA contends that Nixon did not satisfy the Class 1 definition of eligible employee after March 2, 1996.  Because the effective date of the LINA plan was April 1, 1996, the court agrees with LINA to the extent that, in order to be eligible for insurance on or after April 1, 1996, Nixon must have been an "Eligible Employee" on or after that date as well.

The only requirements of the Class 1 definition of eligible employee that the LINA plan defines are "full-time" and "Employee." "Full-time" means "the number of hours set by the Employer as a regular work day for Employees in the Employee's eligibility class." [81]  For eligibility purposes, "Employee" means "an employee of the employer in one of the 'Classes of Eligible Employees.'" [82]  Neither of those definitions is particularly enlightening.  "Full-time" either is redundant due to Class 1's requirement of "regularly working at least 40 hours per week," or contradicts that requirement in cases where the number of hours set by the Employer as a regular work day for employee's in the employee's class is less than 40 hours a week.  Similarly, to be an "Employee" a person must apparently otherwise satisfy only the requirements of Class 1.

■ However, the court need not resolve this difficult question because, assuming that Nixon does meet these requirements, he still does not satisfy the requirement that his disability arose after he became covered under the LINA plan.  Under the LINA plan,

> "An Employee is Disabled if, because of Injury or Sickness,
>
> 1.  he or she is unable to perform all the *material duties* of his or her regular occupation; and
>
> 2.  after Monthly Benefits have been payable for 24 months, he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience." [83]

Because the only issue is when Nixon initially became disabled, only the first prong is relevant to the court's analysis.

Nixon contends that he did not become disabled until late July or early August 1996.[84]  Nixon relies on the following: the evidence showing that he performed "material duties" of his job between March 2, 1996, and August 1, 1996; and Dr. Salvia's note showing that Dr. Salvia found him to be disabled as of August 1, 1996.[85]

In contrast, LINA argues that Nixon became disabled on March 2, 1996.[86]

---

79.  *See LINA's brief, filed May 22, 1998, at 15–18.*

80.  *Id.* at 16.

81.  Record, exhibit PX H4 at 1.

82.  *Id.*

83.  Record, exhibit PX H4 at 5 (emphasis added).

84.  *See* Plaintiff's brief, filed May 8, 1998, at 17–18.

85.  *See id.*

86.  *See* LINA's brief, filed May 22, 1998, at 16–18.

LINA relies on the following: the evidence showing that Drs. Salvia and Coleman determined that Nixon was disabled as of that date; and Nixon's testimony of the side effects of his medication as of March 2, 1996.[87]

On a piece of his prescription note paper dated April 16, 1997, referring to Nixon, Dr. Salvia handwrote "Disabled as of 01 August 1996."[88] However, in a typed letter dated four months later, August 12, 1997, in response to LINA's inquiry, Dr. Salvia indicated that he had reconsidered his earlier conclusion. Dr. Salvia wrote:

"After Mr. Nixon's initial myocardial infarction in March of '96 there was hope that Mr. Nixon's clinical status and exercise capacity would reach a level that would enable him to return to work.... Unfortunately, Mr. Nixon's situation never improved well enough that he could return to work and therefore in retrospect, Mr. Nixon has been disabled since his myocardial infarction (3/2/96)."[89]

In or around July 1997, Dr. Spencer Coleman, Nixon's family physician,[90] returned to LINA a form Baccum had sent him with questions regarding Nixon.[91] On the form, Dr. Coleman wrote "3/2/96" after the statement "The exact date you feel patient became disabled from performing his occupation."[92]

Based on the form, substance, and more recent date of Dr. Salvia's August 12, 1997, letter, the court finds that that letter more accurately reflects Dr. Salvia's opinion of Nixon's disability date than does his April 16, 1997, note. Therefore, Drs. Salvia and Coleman agree that Nixon became disabled on March 2, 1996. In addition, in adjudicating Nixon's claim for Social Security disability benefits, the Social Security Administration determined that Nixon became disabled on March 2, 1996.[93]

While the opinions of these doctors and the Social Security Administration are relevant to the court's determination of when Nixon became disabled, see Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1314 (11th Cir.1999) (per curium), they are not dispositive. That is because the LINA plan defines disabled in terms of the employee's actual ability to do the "material duties" of his occupation. Therefore, the most important factor in determining when Nixon became disabled is when, based on the evidence, Nixon lost the capacity to work at his occupation as a truck driver, the job for which he was hired.

Nixon became disabled when he was "unable to perform all the material duties of his ... regular occupation."[94] As stated, Nixon understood that he was hired as a truck driver and that, as a truck driver, he would have up time when, for example, he could work for three months with hours that greatly exceeded 40 per week, and then have down time with three months off doing light and limited work, but with the result that his average time and pay would, over time, be comparable to 40 hours per week.[95] And, more specifically, he understood that the position would require him to drive an 18-wheel truck to and from HealthSouth's roadshows, assist with the roadshows, load and unload the truck, and be away from home for up to three months at a time.[96] Admittedly, as discussed, prior to March 2, 1996, Nixon actually drove a truck and did related manual labor for HealthSouth only a relatively small percentage of the time—ap-

87. *See id.*

88. Record, exhibit DX L10.

89. *Id.*, exhibit DX L12 at 2.

90. *See id.*, exhibit PX H29.

91. *See id.*, exhibit DX L12A.

92. *Id.*

93. *See* Record, exhibit DX L15 at 1.

94. *Id.*, exhibit PX H4 at 5.

95. Deposition of Plaintiff at 68–69.

96. *See* Plaintiff's brief, filed May 8, 1998, at 1; Deposition of Plaintiff at 68–69, 84; Record, exhibit PX L1 at 34; LINA's brief, filed May 22, 1998, at 4.

proximately one out of six weeks.[97] However, Nixon was hired as a truck driver and, thus, his main job or duty was to drive a truck; because of his heart problem, he simply was not able to do the truck-driving work he was hired to do when later called on. It is thus undisputed that Nixon did not and was unable to drive a truck after March 2, 1996; he was essentially in down time permanently after that date.

In sum, the opinions of Nixon's doctors, the Social Security Administration's finding, and the inability of Nixon to drive a truck after March 2, 1996, show that Nixon became disabled on March 2, 1996, and the court finds that Nixon became disabled on that date. As a result, Nixon did not become disabled while covered under the LINA plan and, accordingly, is not entitled to long-term-disability benefits.

3.

■ Even if Nixon became disabled after April 1, 1996, he would still be barred from recovering benefits because his disability resulted from a pre-existing condition.

The LINA plan provides that it

"will not pay Monthly Benefits for any period of Disability caused by or contributed to by, or resulting from, a Pre–Existing Condition....

. . .

Except for any amount of benefit in excess of a Prior Plan's benefits, the Pre–Existing Condition Limitation will not apply to an Employee covered under a Prior Plan who satisfied the pre-existing condition limitation, if any, under that plan."[98]

The plan defines "pre-existing condition" as "any Injury or Sickness for which the Employee incurred expenses, received medical treatment, care or services including diagnostic measures, took prescribed drugs or medicines, or for which a reasonable person would have consulted a physician *within 3 months* before his or her recent effective date of insurance."[99] As discussed, Nixon's disability was caused by his March 2, 1996, heart attack. The issue, therefore, is whether his March 2 heart attack was a "pre-existing condition."

Nixon was hospitalized and underwent surgery on March 2, 1996, for the heart attack that he suffered on that date.[100] At his deposition, Nixon admitted that the March 2 heart attack was his "first heart-associated problem" and that he "had never had heart trouble prior to [that date]."[101] Nixon's March 2 heart attack was within three months of his effective date of insurance, April 1, 1996. Therefore, Nixon's March heart attack is a "pre-existing condition."

Nixon, however, contends that his pre-existing condition does not bar his right to receive benefits under the LINA plan because LINA has not shown that he does not satisfy the pre-existing condition clause of his "Prior Plan," the Metropolitan Life Plan.[102] Nixon's argument is unpersuasive. Nixon never became eligible to receive benefit under the Metropolitan Life Plan because that plan required him to "complete 6 months of continuous service as an Employee of the Employer" before he would be covered under that plan.[103] Nixon completed less than three months of service with HealthSouth before it changed long-term disability insurance carriers from Metropolitan Life to LINA on April 1, 1996.[104]

**97.** Deposition of Plaintiff at 25–27, 43.

**98.** *Id.*, exhibit PX H4 at 12.

**99.** *Id.* (emphasis added).

**100.** *See* Plaintiff's brief, filed May 8, 1998, at 4; Record, exhibit PX L1 at 46.

**101.** Deposition of Plaintiff at 106–07.

**102.** *See* Plaintiff's brief, filed May 8, 1998, at 20–21.

**103.** Record, exhibit PX H11 at 5.

**104.** Regardless, the Metropolitan Life plan's pre-existing condition limitation clause does not help Nixon. It provides: "This Plan does not provide benefits for any Disability that is caused by, contributed to by, or resulting from a Pre–Existing Condition, unless the Dis-

■ Finally, Nixon argues that the LINA plan's pre-existing-condition limitation cannot be enforced against him because he did have notice of the limitation on or before the date he suffered his first heart attack.[105] Nixon reasons that the LINA plan description. was not printed until August 1996, after he left employment with HealthSouth, and "it would have been impossible for [him] to obtain any document giving notice of the preexisting illness provision at any before [sic] his employment terminated."[106] Nixon relies on *Bartlett v. Martin Marietta Operations Support, Inc. Life Ins. Plan*, 38 F.3d 514 (10th Cir.1994).

In *Bartlett*, the Tenth Circuit Court of Appeals held that, where an employee reasonably relied on language in a workbook describing an ERISA plan, the district court did not err in disregarding language in a subsequently published summary plan description that materially changed the terms of the plan and that was not available to the employee at the time of his reliance on the workbook's language. *See* 38 F.3d at 516–17.

*Bartlett* does not help Nixon. *Bartlett* stands for the proposition that subsequent modifications to an ERISA plan, through drafting of a summary-plan description, do not affect the terms of a written plan in existence when an employee's claim arose. Nixon is correct that the summary-plan description for the LINA plan was not drafted or available until after HealthSouth terminated his employment. However, the LINA plan's pre-existing-condition-limitation clause and its definition of

pre-existing condition are materially identical to those in the Metropolitan Life plan summary.[107] Therefore, unlike in *Bartlett*, the later published LINA plan summary did not materially change the terms of the Metropolitan Life plan that was in existence on the dates of Nixon's hire and disability. Consequently, Nixon is not prejudiced by having to satisfy the LINA plan's pre-existing-condition limitation.

### B. Nixon's Claim Against HealthSouth

Nixon argues that HealthSouth breached its fiduciary duty to him by failing to disclose adequately the terms and conditions of the LINA plan in the information that he received at orientation.[108] According to Nixon:

> "[T]he only information HealthSouth provided Nixon concerning the plan is contained in [HealthSouth's employee handbook and booklet describing HealthSouth's employee benefit plan that he received at orientation]. These documents failed to inform Nixon of numerous restrictive provisions in the policy, including the set-off for social security, the preexisting illness clause, and the supposed requirement that the employee be 'actively at work.' "[109]

In response, HealthSouth argues that it did not misrepresent the terms and conditions of the LINA plan to Nixon.[110]

■ Nixon and HealthSouth agree that HealthSouth is a fiduciary under the LINA plan.[111] A fiduciary is required to act with loyalty and prudence in favor of

---

ability begins after you have been covered under This Plan for 12 months in a row." *Id.* at 14. The Metropolitan Life plan defines "Pre–Existing Condition" as "a Sickness or Injury for which you received Medical Advice or Treatment during the 3 month period immediately prior to your effective date of Personal Benefits." *Id.* at 8.

**105.** *See* Plaintiff's brief, filed May 8, 1998, at 21.

**106.** *Id.*

**107.** *See* Record, exhibits PX H4 at 12, PX H11 at 8, 14.

**108.** *See* Plaintiff's brief, filed May 8, 1998, at 25–27.

**109.** *Id.* at 25.

**110.** *See* HealthSouth's brief, filed May 22, 1998, at 11–18. HealthSouth also contends that it is not a fiduciary with respect to LINA's decision to deny Nixon benefits under the LINA plan and, therefore, is not liable to him for LINA's decision to deny his claim. *See id.* at 10–11.

**111.** HealthSouth does not dispute Nixon's assertion that HealthSouth is a fiduciary under the LINA plan regarding disclosure of the terms of the plan. *See id.* at 11–18.

the plan's participants. *See* 29 U.S.C.A. § 1104(a); *Evans v. Bexley,* 750 F.2d 1498, 1499 (11th Cir.1985). A fiduciary, accordingly, may not affirmatively mislead a participant.

▮ Here, there is no evidence that HealthSouth mislead Nixon of the terms and conditions of the LINA plan through the information that it gave him at orientation or otherwise. At his orientation on January 22, 1996, Nixon received a packet of information that included HealthSouth's employee handbook and a booklet describing HealthSouth's employee benefit plan.[112]

HealthSouth's employee handbook which Nixon received provides:

"This Employee Handbook is intended to provide you with a general understanding of HEALTHSOUTH as a company and its human resources policies and procedures. You are encouraged to familiarize yourself with its contents. This handbook does not cover every aspect of your job and is not an employment contract. You are encouraged to consult your supervisor with questions regarding policies or procedures.

. . .

Orientation Period
Your first 90 days of employment are an orientation and training period. You will receive general information about HEALTHSOUTH, your job duties and department rules. During this orientation period, you will build your proficiency in your job and become better acquainted with the Company and its operations. Important information for your orientation in contained in this handbook and other information given to you upon employment. Please familiarize yourself with the materials and ask your supervisor any questions that arise.

. . .

HEALTHSOUTH is committed to providing you with a comprehensive benefits package. The following is a brief summary of your benefits. Each benefit plan is explained in more detail in the employee benefits materials provided to you during orientation.

. . .

Long–Term Disability
Full-time employees are provided Long–Term Disability coverage at no charge after completing six months of employment. This insurance coverage gives you the security of assured income if you are disabled for an extended period due to an injury or illness."[113]

The booklet, which Nixon received at orientation, describing HealthSouth's employee benefit plan states:

LONG TERM DISABILITY
"To be eligible to participate in the plan an employee must be employed for a period of 6 months. There are no enrollment forms to complete. Enrollment in the plan is automatic on the employee's 6–month anniversary. . . .
The HEALTHSOUTH Long Term Disability Plan provides partial income replacement for employees who have been totally disabled for 6 months. The monthly benefit amount is equal to 60% of the employee's base monthly earnings up to a maximum of $7500 per month."[114]

Nixon does not contend that the information that he received at orientation is inaccurate. Instead, he argues that it does not disclose the whole story regarding his long-term-disability benefits.[115] However, as it states, the employee handbook is not intended to provide every detail of employment, including benefits: "This handbook does not cover every aspect of your job . . . . You are encouraged to consult your

---

112. *See* Plaintiff's brief, filed May 8, 1998, at 2; Deposition of Angela Lee Houston at 85–86; Deposition of Plaintiff at 98, 152, 165; Record, exhibit DX HS2.

113. Record, exhibit PX H5 at 4, 7, 10, 12.

114. *Id.,* exhibit PX 1 at 4; *see also* Plaintiff's brief, filed May 8, 1998, at 2.

115. *See* Plaintiff's brief, filed May 8, 1998, at 24–26.

supervisor with questions regarding policies or procedures." Therefore, Nixon cannot persuasively argue that he could expect the handbook to explain fully HealthSouth's long-term-disability plan or that he reasonably relied on it to do so.

Furthermore, the handbook and benefits booklet that Nixon received at orientation accurately summarized the long-term disability-plan that HealthSouth had in place at that time. At that time, HealthSouth's long-term-disability-insurance plan was with Metropolitan Life.[116] Houston testified that from the date of Nixon's hire until the date HealthSouth changed its long-term-disability insurance carrier to LINA on April 1, 1996, the Metropolitan Life plan summary was given to HealthSouth employees at orientation and otherwise available to all HealthSouth employees.[117] Nixon contends that he did not receive the Metropolitan Life plan summary at his orientation. However, even assuming he did not, there is no evidence that he requested a copy of the plan summary thereafter either. If Nixon wanted to know the specifics of that plan, he should have read the plan summary. As discussed, the Metropolitan Life plan summary discloses its pre-existing-condition-limitation clause, which is materially identical to the parallel clause in the LINA plan. For these reasons, the court finds that HealthSouth did not mislead Nixon regarding the terms and conditions of its long-term-disability insurance. Therefore, Nixon's claim against HealthSouth fails.

### C. HealthSouth's Cross-Claim Against LINA

HealthSouth requests indemnification from LINA if the court finds that HealthSouth is liable to Nixon for long-term-disability benefits.[118] Because the court has found in favor of HealthSouth on Nixon's claim against it, the court will deny HealthSouth's cross-claim against LINA.

## IV. CONCLUSION

Based on the foregoing, the court will enter judgment in favor of LINA and HealthSouth on Nixon's claims against them and will deny HealthSouth's cross-claim against LINA. An appropriate judgment will be issued.

---

116. *See* Deposition of Angela Lee Houston at 42–43, 93–94.

117. *See id.* at 85, 97.

118. *See* HealthSouth's brief, filed May 22, 1998, at 18.